# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

MOHAMMAD MASROOR,

Defendant-Appellant.

FOR PUBLICATION
November 24, 2015
9:25 a.m.

Nos. 322280; 322281; 322282
Wayne Circuit Court
LC Nos. 14-000869-FC;
        14-000858-FC;
        14-000857-FC

Before: GLEICHER, P.J., and SAWYER and MURPHY, JJ.

PER CURIAM.

A jury convicted defendant of multiple counts of criminal sexual conduct in these three consolidated cases. The complainants were defendant's young nieces. Defendant lived in their Detroit home for several years when the girls were under age 13. They revealed the abuse many years later.

Defendant challenges the admission of other-acts evidence, asserts that his counsel performed ineffectively, and claims that the trial court improperly imposed a substantial departure sentence. Although the trial court should have evaluated the other acts evidence under MRE 403, this error was harmless as the evidence qualified as admissible. Nor do we discern a ground for reversal regarding counsel's performance.

Defendant's departure sentence presents a more nuanced issue. Because we are bound by this Court's recent decision in *People v Steanhouse*, ___ Mich App ___; ___ NW2d ___ (Docket No. 318329, issued October 22, 2015), pursuant to MCR 7.215(J)(1), we must remand this matter to the trial court for reconsideration of defendant's sentence at a hearing modeled on the procedure set forth in *United States v Crosby*, 397 F3d 103 (CA 2, 2005). Were we not obligated to follow *Steanhouse*, we would affirm defendant's sentence by applying the federal "reasonableness" standard described in *Gall v United States*, 552 US 38, 46; 128 S Ct 586; 169 L Ed 2d 445 (2007), and specifically rejected by our colleagues in *Steanhouse*. Pursuant to MCR 7.215(J)(2), we declare a conflict with *Steanhouse* so that the procedure established by that panel may be more carefully considered by a larger number of the judges of this Court. In the meantime, we affirm defendant's convictions and remand for resentencing pursuant to *Steanhouse*.

-1-

Defendant emigrated from Bangladesh to Detroit in 2000 and moved into his brother's family home. The complainants, defendant's nieces, were then ages 12, 11 and 9. The eldest, RSS, testified that defendant began touching her breasts and vagina within days of his arrival, and penetrated her with his penis a week later. The sexual abuse continued even after defendant's wife and five children arrived and he moved with them to a nearby home in Hamtramck.

Toward the end of 2001, defendant's second-eldest niece, MK, questioned RSS in a manner suggesting that defendant had also abused MK. RSS warned defendant "to stay away from my sister." Defendant "disagreed he was doing anything" with MK. Later, RSS and defendant forged an agreement that she would have a "relationship" with defendant if he left MK alone. Defendant ensured RSS's silence by threatening that "in our culture if a girl, if she's not a virgin . . . then the parents, and this is how they can . . . get her killed."

MK recalled that defendant persuaded her parents that she and her younger sister should be home-schooled when they reached puberty. Defendant offered to tutor the girls, as he was well versed in the Koran. He began sexually abusing MK when the home schooling commenced. The abuse continued even after defendant and his family moved to their new residence. MK explained that she cooperated with defendant because he manipulated her by invoking the Koran and insisting that "[w]e're the ones . . . making him do this. And it's not his fault, so it's our fault." Because defendant had studied theology, MK believed him.

MAB was nine years old when defendant first put her hand on his penis. He penetrated her with his finger on numerous occasions thereafter. Defendant guaranteed MAB's silence by forcing her to take an "oath" that she would "let him do whatever he want and I cannot tell him no" in exchange for defendant's agreement to fix a computer that MAB incorrectly believed she had broken. At the end of 2002, defendant violated her with his penis.

In 2008, defendant and his family moved to Canada, where defendant became the imam at a Toronto mosque. Defendant's crimes came to light in 2011, when one of his daughters revealed to her sister and mother that defendant had engaged in sexual intercourse with her. Shortly thereafter, the complainants in these cases reported defendant's sexual acts to the police. The Wayne County prosecutor charged defendant with multiple counts of criminal sexual conduct involving the three complainants, and the trial court consolidated the cases for trial. During the trial, the prosecutor presented the testimony of defendant's five children who related that defendant had perpetrated sexual assaults against them similar to those described by defendant's nieces.

The jury convicted defendant of ten counts total of first-degree criminal sexual conduct—four counts under MCL 750.520b(1)(a) (victim under 13 years of age) and six counts based on multiple variables, including MCL 750.520b(1)(b)(*ii*) (victim at least 13 but less than 16 years of age and a relative). The jury also convicted defendant of five counts of second-degree criminal sexual conduct, MCL 750.520c(1)(a) (victim under 13 years of age). The trial court sentenced defendant to 35 to 50 years' imprisonment for each of his 10 first-degree criminal sexual conduct convictions and 10 to 15 years' imprisonment for each of his five second-degree criminal sexual

conduct convictions. We consolidated defendant's three appeals. *People v Masroor*, unpublished order of the Court of Appeals, entered July 2, 2014 (Docket Nos. 322280, 322281, 322282).

II.

Defendant first contends that the trial court erred by admitting the other-acts evidence provided by his children. During a pretrial motion hearing, the trial court indicated that it was inclined to allow the evidence based on "a statute . . . that kind of trumps or transcends" MRE 404(b). The court expressed that when applying "the statute," it was "not even required to indulge in the balancing of prejudicial versus probative. It's, it's just in." Defense counsel objected to the admission of this evidence by asserting, "I think there should be some sort of balancing test." The trial court ruled the evidence admissible without engaging in a balancing analysis. On the fourth day of the trial, the prosecutor directed the trial court's attention to *People v Watkins*, 491 Mich 450, 467; 818 NW2d 296 (2012), which, as we will discuss in greater detail, most assuredly requires the application of a "balancing test" for evidence offered under MCL 768.27a, the "statute" referenced by the court.

The trial court repeatedly characterized the testimony at issue as "404(b)" evidence. MRE 404(b)(1) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

The prosecutor actually premised his request to admit the other acts evidence on MCL 768.27a rather than MRE 404(b). MCL 768.27a states:

> (1) Notwithstanding section 27 [MCL 768.27, the statutory analog of MRE 404(b)], in a criminal case in which the defendant is accused of committing a listed offense against a minor, evidence that the defendant committed another listed offense against a minor is admissible and may be considered for its bearing on any matter to which it is relevant. If the prosecuting attorney intends to offer evidence under this section, the prosecuting attorney shall disclose the evidence to the defendant at least 15 days before the scheduled date of trial or at a later time as allowed by the court for good cause shown, including the statements of witnesses or a summary of the substance of any testimony that is expected to be offered.

> (2) As used in this section:

> (a) "Listed offense" means that term as defined in section 2 of the sex offenders registration act, 1994 PA 295, MCL 28.722.

(b) "Minor" means an individual less than 18 years of age.

In *Watkins*, 491 Mich at 468, our Supreme Court concluded that MRE 404(b) and MCL 768.27a irreconcilably conflict. While MRE 404(b) requires the exclusion of other-acts evidence if its only relevance is to show the defendant's character or propensity to commit the charged crime, *Watkins*, 491 Mich at 468, MCL 768.27a allows the admission of evidence that the defendant committed another listed offense for its bearing on any matter to which it is relevant, including the defendant's character and propensity to commit the charged offense, *Watkins*, 491 Mich at 469-470. Thus, "MCL 768.27a permits the admission of evidence that MRE 404(b) precludes." *Watkins*, 491 Mich at 470.

> Parsed out, MCL 768.27a can be rephrased as follows: In spite of the statute [MCL 768.27, which codified what became the substance of MRE 404(b)] limiting the admissibility of other-acts evidence to consideration for noncharacter purposes, other-acts evidence in a case charging the defendant with sexual misconduct against a minor is admissible and may be considered for its bearing on any matter to which it is relevant. Thus, the statute establishes an exception to MRE 404(b) in cases involving a charge of sexual misconduct against a minor. [*Watkins*, 491 Mich at 471.]

The *Watkins* Court further held "that MCL 768.27a is a valid enactment of substantive law to which MRE 404(b) must yield." *Watkins*, 491 Mich at 475.

Nonetheless, evidence admissible under MCL 768.27a may "be excluded under MRE 403 if 'its probative value is substantially outweighed by the danger of unfair prejudice . . . .' " *Watkins*, 491 Mich at 481, quoting MRE 403. However, "when applying MRE 403 to evidence admissible under MCL 768.27a, courts must weigh the propensity inference in favor of the evidence's probative value rather than its prejudicial effect. That is, other-acts evidence admissible under MCL 768.27a may not be excluded under MRE 403 as overly prejudicial merely because it allows a jury to draw a propensity inference." *Watkins*, 491 Mich at 487.

> This does not mean, however, that other-acts evidence admissible under MCL 768.27a may never be excluded under MRE 403 as overly prejudicial. There are several considerations that may lead a court to exclude such evidence. These considerations include (1) the dissimilarity between the other acts and the charged crime, (2) the temporal proximity of the other acts to the charged crime, (3) the infrequency of the other acts, (4) the presence of intervening acts, (5) the lack of reliability of the evidence supporting the occurrence of the other acts, and (6) the lack of need for evidence beyond the complainant's and the defendant's testimony. This list of considerations is meant to be illustrative rather than exhaustive. [*Watkins*, 491 Mich at 487-488 (citations omitted).]

The Supreme Court instructed trial courts to engage in the MRE 403 balancing analysis with respect to each separate piece of evidence offered under MCL 768.27a. *Watkins*, 491 Mich at 489. If a trial court determines that MRE 403 does not bar the introduction of other-acts evidence admissible under MCL 768.27a, a limiting instruction may be given to ensure that the jury properly uses the evidence. *Watkins*, 491 Mich at 490.

Despite the trial court's lack of familiarity with *Watkins* and its failure to perform the requisite balancing, we discern no error requiring reversal. Defense counsel sought application of a "balancing test," but never articulated any manner in which an unfairly prejudicial aspect of the other acts evidence surpassed its probity. And on appeal, counsel has failed to shed any additional light on how or why a danger of unfair prejudice should have precluded the introduction of the indisputably probative evidence. In other words, defendant has put nothing on the "prejudice" side of the scale that might outweigh the evidence's probative force. Defendant now insists that the evidence portrayed him as a "monster preying on children," but this argument falls far short of addressing the relevancy considerations set forth in *Watkins*. The evidence was highly probative of defendant's propensity to sexually abuse children and his plan, scheme, or system for committing such acts, MRE 404(b)(1). The trial court did not abuse its discretion by admitting it.

III.

Defendant next contends that his attorney furnished constitutionally ineffective assistance by failing to offer any cogent argument against the admission of the other acts evidence, and by conducting cross examinations that revealed more damaging evidence than had been elicited on direct exam. Because defendant did not move for a new trial or an evidentiary hearing, our review is limited to mistakes apparent on the existing record. *People v Petri*, 279 Mich App 407, 410; 760 NW2d 882 (2008). We review the ultimate constitutional question arising from an ineffective assistance claim de novo. *Id*.

In evaluating counsel's performance we must begin by assuming that counsel served effectively. *People v Swain*, 288 Mich App 609, 643; 794 NW2d 92 (2010). "To prove a claim of ineffective assistance of counsel, a defendant must establish that counsel's performance fell below objective standards of reasonableness and that, but for counsel's error, there is a reasonable probability that the result of the proceedings would have been different." *Id.* The defendant must overcome the presumption that counsel's decisions were sound trial strategy. *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999). Counsel enjoys great latitude in matters of trial strategy and tactics. *People v Pickens*, 446 Mich 298, 330; 521 NW2d 797 (1994). That a defense strategy ultimately fails does not establish ineffective assistance of counsel. *People v Kevorkian*, 248 Mich App 373, 414-415; 639 NW2d 291 (2001).

Trial counsel's failure to offer a more salient balancing argument pursuant to *Watkins* may have fallen below objectively reasonable professional standards, but this omission did not affect the outcome of defendant's trial. Even had counsel advanced a proper argument, we are confident that the other acts evidence would have been admitted. Appellate counsel has presented no reason to think the evidence was *unfairly* prejudicial for the possible reasons listed in *Watkins*, or subject to exclusion on any other ground. Accordingly, no reasonable probability exists that a timely citation to *Watkins* or more focused legal reasoning would have yielded a different verdict.

Defendant's remaining ineffective assistance arguments arise from counsel's cross-examination of the complainants. During the three cross-examinations, counsel attempted to undermine the witnesses' credibility by confronting them with excerpts of their preliminary examination testimony and perceived inconsistencies in their courtroom statements. While

questioning the three women, counsel referenced several sexual acts committed and threats made by defendant that had not been exposed during the complainants' direct examination.

We disagree that the tactical choices made by defense counsel during cross-examination constitute performance falling below an objective standard of reasonableness. *Strickland* instructs that "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 US at 689. Given the complainants' extraordinarily damaging direct testimonies, counsel was faced with a need to discredit these witnesses through impeachment. Counsel used the tool he had available—testimonial inconsistency. His vigorous cross-examinations reflected an informed trial strategy intended to provide the jury with some basis for disbelieving the complainants and this approach fell within the wide range of professionally competent assistance. Furthermore, the few additional sexual acts or threats referenced during the cross-examinations were highly unlikely to have played any role in the jury's verdict. Accordingly, we conclude that defendant has failed to establish either deficient performance or prejudice.

IV.

We turn to defendant's sentence. Under the now advisory sentencing guidelines, the probation department calculated defendant's minimum sentence range as 108 to 180 months. The trial court recalculated this range by adding and subtracting points under the prior record and offense variables, but the range remained the same. Reasoning that this case "crie[d] out" for a departure sentence, the court adopted the prosecutor's suggestion that defendant serve a minimum term of 35 to 50 years' imprisonment for each of the 10 counts of first-degree criminal sexual conduct. Defendant's minimum sentence exceeds the maximum calculated under the guidelines by 20 years, or 133%.

Trial counsel objected to the scoring of defendant's guideline sentence pursuant to *Alleyne v United States*, 570 US __; 133 S Ct 2151, 2155; 186 L Ed 2d 314 (2013), in which the United States Supreme Court held that any fact that increases a defendant's statutory mandatory minimum sentence is an "element" of the crime that must be submitted to a jury. Appellate counsel raises the same argument. Recently, our Supreme Court relied on *Alleyne* in holding that Michigan's sentencing scheme, which permits judicial fact-finding in scoring the offense and prior record variables, violates the Sixth Amendment. *Lockridge*, __ Mich __; __ NW2d __ (2015), slip op at 1-2. The Michigan Supreme Court remedied that defect by rendering Michigan's sentencing guidelines advisory, just as the United States Supreme Court had done with regard to the federal sentencing guidelines in *United States v Booker*, 543 US 220, 233; 125 S Ct 738; 160 L Ed 2d 621 (2005). *Lockridge*, __ Mich __, slip op at 2.

Although Michigan's sentencing guidelines are "constitutionally deficient," our Supreme Court decreed in *Lockridge* that trial courts must still score the offense and prior record variables and assess the "highest number of points possible" for each one. *Lockridge*, __ Mich at __, slip op at 29 n 28. A sentencing court is obligated to "consult the applicable guidelines range and take it into account when imposing a sentence." *Id*. at 29. Directly pertinent to this case, the Supreme Court further held that when a court has calculated a mandatory minimum sentence range based on facts not found by a jury, "the sentencing court may exercise its discretion to

depart from that guidelines range without articulating substantial and compelling reasons for doing so. A sentence that departs from the applicable guidelines range will be reviewed by an appellate court for reasonableness." *Id*., citing *Booker*, 543 US at 261.

Neither trial nor appellate counsel had the benefit of *Lockridge* when they formulated their objections to defendant's departure sentence. On appeal, counsel contends that the trial court lacked substantial and compelling reasons for the departure sentence, and that the sentence qualifies as disproportionate under the Eighth Amendment. We construe these legal challenges as preserved objections to the reasonableness of defendant's sentence. In *Lockridge*, the Supreme Court did not elaborate on how the reasonableness standard is to be applied, despite that the sentence in that case also represented an upward departure from the guidelines.

The Supreme Court described the departure sentence imposed on Mr. Lockridge as a "minimal (10-month) departure above the top of the guidelines minimum sentence range." *Lockridge*, __ Mich at __, slip op at 3 n 2. In imposing this sentence, the trial court offered several "substantial and compelling reasons justifying the departure," including that:

> defendant had violated probation orders that forbade him from being where he was when he killed his wife, that he killed his wife in front of their three children as they struggled to stop him from doing so, and that he left the children at home with their mother dead on the floor without concern for their physical or emotional well-being, which were not factors already accounted for in scoring the guidelines. [*Id*. at 4.]

The Supreme Court affirmed the defendant's sentence without further analysis, implicitly finding it reasonable but offering no insight as to the proper execution of the evaluative task.[1]

Although defendants receiving departure sentences cannot demonstrate prejudicial error arising from the calculation of their guidelines, *Lockridge* clearly instructs us to review departure sentences for "reasonableness[,]" *id*. at 2, 29, and specifically directs sentencing courts to "justify the sentence imposed in order to facilitate appellate review." *Id*. at 29. Because our Supreme Court relied on *Booker* in erecting a "reasonableness" standard of review for departure sentences, logic dictates that federal caselaw should inform the contours of that standard. In

---

[1] The Court determined that judicially found facts were used to increase Lockridge's mandatory minimum sentence, contravening the Sixth Amendment. *Lockridge*, __ Mich at __, slip op at 31. However, the Supreme Court did not order a remand for resentencing, explaining: "Because he received an upward departure sentence that did not rely on the minimum sentence range from the improperly scored guidelines (and indeed, the trial court necessarily had to state on the record its reasons for *departing* from that range), the defendant cannot show prejudice from any error in scoring the OVs in violation of *Alleyne*." *Id*. Furthermore, the Court indicated in a footnote that "the reasons articulated by the trial court adequately justified" the departure sentence imposed. *Id*. at 3 n 2. We presume that although the Supreme Court elected to refrain from conducting a detailed reasonableness analysis in *Lockridge*, it nevertheless intended that in future cases, a reasonableness standard would be applied by this Court.

*Lockridge*, the Supreme Court traced the evolution of the United States Supreme Court's sentencing jurisprudence in considerable detail, beginning with that Court's decision in *McMillan v Pennsylvania*, 477 US 79; 106 S Ct 2411; 91 L Ed 2d 67 (1986), and culminating in *Alleyne*. We would follow a similar tack in elucidating a framework for "reasonableness" review but for this Court's opinion in *Steanhouse*, which commands us to submit defendant's sentence to a "proportionality" review under *People v Milbourn*, 435 Mich 630; 461 NW2d 1 (1990), by remanding to the trial court for a new sentencing hearing conducted as prescribed by the United States Court of Appeals for the Second Circuit in *Crosby*.[2]

In the next section of this opinion, we apply *Steanhouse* to the facts of this case. In section VI, we set forth the federal reasonableness standard that we would apply but for *Steanhouse*, and in Section VII we explain why the federal reasonableness standard should be adopted by a conflict panel of this Court and by the Michigan Supreme Court.

V.

According to *Steanhouse*, __ Mich App at __, slip op at 21, 23-24, this Court reviews a departure sentence for "reasonableness" under an abuse-of-discretion standard governed by whether the sentence fulfills the "principle of proportionality" set forth in *Milbourn* "and its progeny." (Quotation marks and citation omitted.) In a nutshell, *Milbourn*'s "principle of proportionality" requires a sentence "to be proportionate to the seriousness of the circumstances surrounding the offense and the offender." *Milbourn*, 435 Mich at 636. *Milbourn* instructs that departure sentences "are appropriate where the guidelines do not adequately account for the important factors legitimately considered at sentencing" such that the sentence range calculated under the guidelines "is disproportionate, in either direction, to the seriousness of the crime." *Id.* at 656-657. The *extent* of the departure must also satisfy the principle of proportionality. *Id.* at 660.

We now apply these principles to defendant's departure sentence.

After announcing that defendant's crimes merited a departure sentence, the trial court continued that although all criminal sexual conduct cases against a child under 13 years of age are horrible, this case stood out as "uniquely vile and horrible for many reasons." The court noted that there were three complainants who were family members and who trusted defendant. The court also mentioned the "vile nature of . . . defendant's conduct" in using his position as a religious leader in the family and as a teacher of the complainants to perpetrate the abuse.

> And so the, the violation, the sexual violations that they experienced, their own sort of superstition about how that would be consequential in their lives and what would happen to them if anybody found out, and that they had to respect

---

[2] *Crosby* does not dictate automatic resentencing. Rather, in a *Crosby* remand, the court may " 'determine whether to resentence, now fully informed of the new sentencing regime, and if so, to resentence. . . .' " *Lockridge*, __ Mich at __, slip op at 33, quoting *Crosby*, 397 F3d 117-118 (emphasis omitted).

-8-

their, their uncle, the imam, even while he [was] sexually assaulting them really makes this case especially uniquely horrible in terms of their – of the psychological impact that these crimes had on them, and, and the great trauma that they obviously were experiencing just in testifying in this case many years after the fact.

The court observed that defendant was convicted of 15 different acts of criminal sexual conduct, including 10 counts of first-degree criminal sexual conduct and five counts of second-degree criminal sexual conduct. The court noted that there was a maximum of 20 points assessed under prior record variable (PRV) 7 (subsequent or concurrent felony convictions) where the offender has two or more subsequent or concurrent felony convictions. See MCL 777.57(1). The court observed that the variables may be used "as a springboard for articulating reasons for a departure[.]" Here, the court stated, there were *14* contemporaneous felony convictions.

So just on the basis of the verdict alone we can easily score 140 [points] on PRV 7 which would just all by itself push the defendant way over into the top grid on his PRV points.

So [the prosecutor] was not just blowing these numbers out of his ear when he suggested that an appropriate sentence would be 35 to 50 years. There is a basis in the sentencing guidelines themselves if one finds, as I do, that PRV 7, the score on PRV 7 has [been] given inadequate impact given the crimes that the defendant committed.

The court next noted that offense variable (OV) 4 (psychological injury to the victim) provided for an assessment of 10 points for psychological injury to a victim requiring professional treatment. See MCL 777.34(1). The court stated that because there were three victims, "we could, you know, theoretically give him, say, 30 points if we were using OV 4 as a springboard for a proportionality description of a departure reason. And that's objective and verifiable. There were three victims."

The court then addressed OV 13 (continuing pattern of criminal behavior), which provides for an assessment of 50 points if the offense was part of a pattern of felonious criminal activity involving three or more sexual penetrations against a person or persons less than 13 years old. See MCL 777.43(1). The court noted that "the trial evidence was, and, and consistent with the jury's verdict, that there were vastly more of those acts that they found. And that's objective and verifiable."

The trial court then elaborated further regarding its departure decision, using the terminology applicable in pre-*Lockridge* sentencing:

And is it compelling and substantial? Well, I don't know how it isn't in this case.

This is, you know, as I said at the beginning of this dissertation, I mean one of the most horrific and horrible sexual abuse crimes I've seen on so many levels. Not just because of the, the relationship between the complainants and the

defendant because it wasn't just uncle and niece, it was uncle slash religious leader and cultural leader and nieces who were victims of his religious orthodoxy as well as his sexual predatory conduct. And it's just a terrible tragedy that this occurred and that the girls were put through this and that they waited as they did as long as they did until they had the comfort of each other's knowledge that, that they had all been through this together before the, the defendant's acts were finally revealed.

If we were to give the defendant just 25 more points on the offense variables which can easily be calculated with 30 points on OV 4, more points on OV 13, that pushes him solidly into the bottom right-hand cell range of 270 to 450.

I couldn't help but notice that [the prosecutor] suggested [that the] number of a 35 year minimum doesn't quite approach the maximum cell length in the lower right-hand corner. But, but it's close, and as I think an appropriate minimum sentence recognizing that it is a departure, a substantial departure from the guideline range in this case.

But the guidelines here for a variety of reasons that I've already said don't even begin to adequately address the heinous nature of the crimes the defendant was convicted of. And I'm adopting the People's suggestion of a 35 to 50 year sentence for each of the ten counts of criminal sexual conduct in the first degree.

The court calculated the minimum period of incarceration for its departure sentence by essentially tripling the applicable guidelines' scores to reflect that there were three complainants in this case. This mathematical reasoning does not necessarily comport with the individualized weighing of an offender's personal characteristics, including those that would mitigate a defendant's sentence, against the circumstances of the offense as required by *Milbourn*. But even were we to find that the trial judge's allocution inadvertently satisfied *Milbourn*, we understand *Steanhouse* to nevertheless require remand for a *Crosby* hearing. The Court's language in *Steanhouse* leaves little room for deferential review:

> While the *Lockridge* Court did not explicitly hold that the *Crosby* procedure applies under the circumstances of this case, we conclude that this is the proper remedy where, as here, the trial court was unaware of and not expressly bound by a reasonableness standard rooted in the *Milbourn* principle of proportionality at the time of sentencing. [*Steanhouse*, slip op at 25.][3]

---

[3] It bears repeating that defendant preserved an objection to his departure sentence in the trial court. In *People v Stokes*, __ Mich App __; __ NW2d __ (Docket No. 321303, issued September 8, 2015), this Court held that the *Crosby* procedure applies to both preserved and unpreserved errors.

In accordance with *Steanhouse*, we remand to the trial court for resentencing. We instruct the trial court to specifically justify the *extent* of any departure sentence the court may elect to impose, and to explain why the sentence imposed is proportionate to the seriousness of the convicted offenses, taking into account defendant's background and any mitigating factors brought forward by counsel. Consistent with the *Crosby* procedure, defendant may elect against resentencing if he chooses. See *id*.

VI.

The proportionality review dictated by *Steanhouse* is at odds with the review applied to departure sentences by the federal courts. In this section of our opinion we discuss the federal standard and the reasons advanced by the United States Supreme Court for its adoption.

In *Booker*, the United States Supreme Court held that "appellate review of sentencing decisions is limited to determining whether they are 'reasonable.' " *Gall v United States*, 552 US 38, 46; 128 S Ct 586; 169 L Ed 2d 445 (2007). The Supreme Court later expounded, "Our explanation of 'reasonableness' review in the *Booker* opinion made it pellucidly clear that the familiar abuse-of-discretion standard of review now applies to appellate review of sentencing decisions." *Id.* The Supreme Court first applied the reasonableness standard and abuse of discretion review in *Rita v United States*, 551 US 338; 127 S Ct 2456; 168 L Ed 2d 203 (2007).

The defendant in *Rita* argued in the trial court for a sentence below the federal guideline range, resting his claim on his "[p]hysical condition, vulnerability in prison and [] military service." *Id*. at 345. The judge imposed a sentence at the bottom of the federal guidelines range, and Rita appealed. *Id*. The "first question" presented to the United States Supreme Court was "whether a court of appeals may apply a presumption of reasonableness to a district court sentence that reflects a proper application of the Sentencing Guidelines." *Id*. at 347. The Supreme Court answered in the affirmative, but added an important caveat: "The fact that we permit courts of appeals to adopt a presumption of reasonableness does not mean that courts may adopt a presumption of unreasonableness" for sentences at variance with the advisory guidelines. *Id*. at 354-355.[4]

---

[4] Although the Court's holding in *Rita* is relatively straightforward, Justices STEVENS and SCALIA debated in concurring opinions whether reasonableness review is limited to examining whether a sentencing court has correctly adhered to sentencing *procedures*, or extends to consideration of the *substantive* reasonableness of a defendant's sentence. Justice SCALIA opined, "I would hold that reasonableness review cannot contain a substantive component at all. I believe, however, that appellate courts can nevertheless secure some amount of sentencing uniformity through the procedural reasonableness review made possible by the *Booker* remedial opinion." *Rita*, 551 US at 370 (SCALIA, J., concurring). Justice STEVENS retorted:

> I do not join Justice SCALIA's opinion because I believe that the purely procedural review he advocates is inconsistent with our remedial opinion in *Booker*, which plainly contemplated that reasonableness review would contain a substantive

-11-

Several months after issuing *Rita*, the Supreme Court addressed appellate review of *departure* sentences in *Gall*, 552 US 38, and *Kimbrough v United States*, 552 US 85; 128 S Ct 558; 169 L Ed 2d 481 (2007). The defendants in both *Gall* and *Kimbrough* received downward departure sentences. In both cases, federal courts of appeal reversed and remanded for resentencing. In *Gall*, the United States Court of Appeals for the Eighth Circuit held that a sentence outside the guidelines range must rest on a justification that is proportional to the extent of the departure. *Gall*, 552 US at 45. As discussed later in this opinion, the Eighth Circuit's approach mirrors that adopted in *Milbourn* and now required under *Steanhouse*. In *Kimbrough*, the Fourth Circuit held the defendant's sentence unreasonable per se because it was based on the sentencing judge's disagreement with the guidelines' sentencing disparity between crack and powder cocaine offenses. *Kimbrough*, 552 US at 93.

The Supreme Court reversed in both cases, holding that both sentences were substantively reasonable. In *Gall*, the Court began its analysis by sketching the following *procedural* roadmap for sentencing in the federal courts:

> [A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark. The Guidelines are not the only consideration, however. Accordingly, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, he may not presume that the Guidelines range is reasonable. He must make an individualized assessment based on the facts presented. [*Id.* at 49-50 (citations omitted).]

Like Michigan's sentencing scheme, federal sentencing involves the review and application of guideline scoring. Unlike Michigan's sentencing procedure, federal law requires district courts to consider all of the sentencing policy factors set forth in 18 USC 3553(a) in addition to the guidelines. Broadly speaking, those factors encompass: (1) the nature and circumstances of the offense and the personal history and characteristics of the offender; (2) the need to deter criminal conduct and to protect the public; (3) the need to provide the defendant with educational or vocational training or other forms of treatment; (4) the alternative types of sentences available; and (5) the need to avoid unwarranted disparity among defendants with similar criminal records who have been convicted of similar crimes.[5] We acknowledge that mandatory application of the

> component. After all, a district judge who gives harsh sentences to Yankees fans and lenient sentences to Red Sox fans would not be acting reasonably even if her procedural rulings were impeccable. [*Id.* at 365 (STEVENS, J., concurring) (citation omitted).]

The Supreme Court has since settled this question, specifically holding in *Gall*, 552 US at 51, that departure sentences are to be reviewed by federal appellate courts for substantive reasonableness.

[5] 18 USC 3553(a) provides:

**(a) Factors to be considered in imposing a sentence.**--The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider--

**(1)** the nature and circumstances of the offense and the history and characteristics of the defendant;

**(2)** the need for the sentence imposed--

**(A)** to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

**(B)** to afford adequate deterrence to criminal conduct;

**(C)** to protect the public from further crimes of the defendant; and

**(D)** to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

**(3)** the kinds of sentences available;

**(4)** the kinds of sentence and the sentencing range established for--

**(A)** the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines--

**(i)** issued by the Sentencing Commission pursuant to [28 USC 994(a)(1)], subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under [28 USC 994(p)]); and

**(ii)** that, except as provided in [18 USC 3742(g)], are in effect on the date the defendant is sentenced; or

**(B)** in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to [28 USC 994(a)(3)], taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under [28 USC 994(p)]);

**(5)** any pertinent policy statement--

**(A)** issued by the Sentencing Commission pursuant to [28 USC 994(a)(2)], subject to any amendments made to such policy statement by act of Congress

§ 3553(a) factors sets federal sentencing apart from Michigan's sentencing process. We return to this important distinction later in this opinion.

After detailing the procedure to be followed by federal district courts when passing sentence, the Supreme Court in *Gall* addressed the substantive considerations that must inhere in a sentence falling outside the guidelines. If a sentencing court intends to impose a departure sentence, the court "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 552 US at 50. The Court characterized as "uncontroversial" the notion that "a major departure should be supported by a more significant justification than a minor one." *Id*. When imposing sentence, a court "must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing." *Id*. The Supreme Court specifically rejected the notion that a sentence outside the guidelines range could be justified only by "extraordinary circumstances." *Id*. at 47. Similarly, the Court eschewed the use of "a rigid mathematical formula that uses the percentage of a departure" as a yardstick for determining the strength of justifications required for a particular sentence. *Id*.

On appeal in the federal courts, the abuse-of-discretion standard applies to the review of all sentences, including departures. *Id.* at 51. A reviewing court first ascertains whether a district court committed procedural error, such as improperly calculating the guidelines. *Id*. If the sentence "is procedurally sound, the appellate court should then consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard." *Id*. For sentences outside the guidelines, "the court may not apply a presumption of unreasonableness. It may consider the extent of the deviation," but must also give deference to the district court's weighing of the § 3553(a) factors. *Id*.

In *Kimbrough*, the Supreme Court reiterated these precepts, emphasizing that a sentencing court must treat the guidelines as "the starting point and the initial benchmark[.]" *Kimbrough*, 552 US at 108 (quotation marks omitted). A departure sentence premised on a judge's view that the guidelines fail to properly reflect the considerations set forth in § 3553(a) may merit "closer review" by an appellate court. *Id*. at 109. In that case, the district court found that the applicable sentencing guidelines for a federal cocaine distribution offense created an "unwarranted disparity" between crack and powder forms of the drug. *Id*. at 111. The federal sentencing commission had reached the same conclusion and recommended that Congress "substantially" reduce the inequity. *Id*. at 97-99. This crack/powder disparity, the district court

(regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under [28 USC 994(p)]); and

**(B)** that, except as provided in [18 USC 3742(g)], is in effect on the date the defendant is sentenced.

**(6)** the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

**(7)** the need to provide restitution to any victims of the offense.

concluded, "[drove] the offense level to a point higher than is necessary to do justice in this case." *Id*. at 111. The Supreme Court found this reasoning adequate to support a sentence 4½ years below the bottom of the guidelines' range, elucidating: "the District Court properly homed in on the particular circumstances of Kimbrough's case and accorded weight to the Sentencing Commission's consistent and emphatic position that the crack/powder disparity is at odds with § 3553(a)." *Id*.

Regarding departure sentencing in the federal courts, we distill from this trilogy of Supreme Court cases the following preliminary precepts governing appellate review of departure sentences in a federal forum:

- An abuse of discretion standard applies;

- A departure sentence is not presumptively unreasonable;

- Close scrutiny must be applied when a sentencing judge bases a departure on a policy disagreement with the guidelines, but a sentence fashioned in part on a policy disagreement does not automatically fall outside the realm of substantive reasonableness.

A review of federal caselaw since *Rita*, *Gall* and *Kimbrough* is also instructive. We focus here on two cases in which the United States Court of Appeals for the Sixth Circuit analyzed upward departure sentences for substantive reasonableness.[6]

Walter Franklin Vowell pleaded guilty to coercing a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of that conduct, and possession of child pornography in violation of 18 USC 2251(a) and 2252(a)(4)(B). *United States v Vowell*, 516 F3d 503, 507 (CA 6, 2008). The district court sentenced him consecutively to 45 years' imprisonment on count one and 20 years on count two, followed by a lifetime of supervised release. *Id*. Vowell challenged the substantive reasonableness of his sentence, and the Sixth Circuit affirmed. *Id*.

The Sixth Circuit began by reviewing in detail the heinous nature of the defendant's crime. Vowell and his girlfriend filmed graphic pornographic videotapes of Vowell sexually abusing the girlfriend's then eight-year-old daughter. *Id*. The child was apparently drugged in two of the videos. *Id*. The sexual abuse included attempted genital and anal penetration, and oral sex. *Id*. The calculated guidelines' range for the two charged offenses was 188-235 months' imprisonment. *Id*. at 508. Notwithstanding that range, a federal statute required a minimum sentence of 300 months. *Id*. The district court imposed a sentence 242% beyond the top of the guidelines range and 160% above the applicable 25-year statutory minimum sentence. *Id*. at 511.[7]

---

[6] Defendant has not raised an appellate claim consistent with procedural unreasonableness.

[7] Technically, under federal law the Sixth Circuit dealt with a "variance" and not a "departure." *Id*. at 511.

The Sixth Circuit explained that when reviewing a sentence for substantive reasonableness, it considers more than the sentence's length:

That is, we will also look to the factors the district court evaluated in determining its sentence. A sentence may be substantively unreasonable if the district court " 'select[s] the sentence arbitrarily, bas[es] the sentence on impermissible factors, fail[s] to consider pertinent § 3553(a) factors or giv[es] an unreasonable amount of weight to any pertinent factor.' " We do not require a mechanical recitation of the § 3553(a) factors, but "an explanation of why the district court chose the sentence that it did." And we have declared that the district court is entitled to deference in its sentencing decisions because of its "ringside perspective on the sentencing hearing and its experience over time in sentencing other individuals." [*Id*. at 510 (citations omitted).]

A substantively reasonable sentence is proportionate to the seriousness of the offense and the circumstances of the offender, and sufficient but not greater than necessary to comport with the purposes of 18 USC 3553(a). *Id*. at 512. In Vowell's case, the Sixth Circuit determined, the district court properly "focused primarily on the seriousness of the offense, the need to protect the community, Vowell's need for treatment, and the impact on the victim." *Id*. at 512. The district court "emphasized that Vowell's pattern of abuse against [the child] and the heinous nature of his crimes demonstrated the seriousness of the offense. That Vowell was in a position to care for [the child] makes his crimes significantly worse." *Id*. The Sixth Circuit recounted the district court's conclusion that Vowell "basically [took the child's] life from her" and that "[h]er life is effectively over for all we know." *Id*. "Certainly," the Sixth Circuit summarized, "the impact on [the child] played a substantial role in the district court's determination." *Id*.

The Sixth Circuit summarized that the record created by the district court included the court's conclusion that Vowell "warranted a significant term of incarceration in order to protect the community, to ensure that he never had the opportunity to be around children again, and that he be afforded the extensive treatment that he clearly needs." *Id*. Moreover, the district court articulated that "it needed to assess a significant punishment in order to combat child pornography." *Id*. These facts led the court to conclude that "for Vowell, the statutory minimum is simply not appropriate." *Id*.

A "departure" is typically a change from the final sentencing range computed by examining the provisions of the Guidelines themselves. It is frequently triggered by a prosecution request to reward cooperation . . . or by other facts that take the case "outside the heartland" contemplated by the Sentencing Commission when it drafted the Guidelines for a typical offense. A "variance," by contrast, occurs when a judge imposes a sentence above or below the otherwise properly calculated final sentencing range based on application of the other statutory factors in 18 USC § 3553(a). [*United States v Rangel*, 697 F3d 795, 801 (CA 9, 2012), citing *United States v Cruz-Perez*, 567 F3d 1142, 1146 (CA 9, 2009).]

This distinction is not relevant for the purposes for which we cite *Vowell*.

The Sixth Circuit commended the district court's reasoning:

> We cannot ask more of a district court, in terms of weighing the § 3553(a) factors and explaining the reasons for its sentence, than the district court did in this case. Clearly, the district court did not arbitrarily choose a sentence, but chose a sentence it considered sufficient but not greater than necessary to comply with the purposes of § 3553(a). That is, the district court selected a punishment that it believed fit Vowell's crimes, and provided sufficient reasons to justify it. [*Id.*]

On review for an abuse of discretion, the Sixth Circuit deferred to the district court's "reasoned . . . decision," declaring the sentence "substantively reasonable." *Id.* at 512-513.

A more recent case provides further guidance. The defendant in *United States v Aleo*, 681 F3d 290, 293 (CA 6, 2012), pleaded guilty to producing child pornography, 18 USC 2251(a), possession of child pornography, 18 USC 2252A(a)(5)(B), and transporting and shipping child pornography, 18 USC 2252A(a)(1). He was sentenced to 60 years' imprisonment, which equated to a sentence almost 2½ times longer than the top of the guidelines range. *Id.* at 300. The Sixth Circuit found Aleo's sentence substantively unreasonable and remanded for resentencing. *Id.* at 302.

Like Vowell, Aleo participated in the production of child pornography. *Id.* at 294-295. Also like Vowell, Aleo sexually penetrated a child (in Aleo's case, his granddaughter) who appeared in the films. *Id.* The district court characterized the matter as "perhaps one of the most despicable cases that I have ever been involved in, in 28 years on the bench." *Id.* at 297. The sentencing court observed that Aleo had shown no remorse, and that his statements at allocution omitted any reference to the fact that his granddaughter and the other victims would be "emotionally scarred for the rest of their lives." *Id.* The district court explicitly rejected the notion that the sentencing guidelines possessed any relevance, as the sentencing guideline committee had never

> anticipated that a granddaughter would be involved in this kind of—a victim, in this kind of activity and certainly not a grandfather doing it. There's no way they would have been able to even foresee that. So the guidelines . . . certainly is not a guideline for this kind of case. . . . [*Id.*]

The Sixth Circuit carefully reviewed the sentencing principles set forth in *Gall*, and reiterated the applicability of the abuse of discretion standard. *Id.* at 300. The Court continued: "Our role is not to usurp the sentencing judge's position as the best interpreter of the facts. However, we must ensure that when there is a variance, the greater the variance from the range set by the Sentencing Guidelines," the more compelling the necessary justification must be. *Id.* The Court then turned its attention to the specific reasons advanced by the district court for the departure sentence, beginning with the district court's "belief that the sentencing guidelines could not have envisioned a crime such as Aleo's. In fact," the Sixth Circuit elaborated, "the Sentencing Guidelines *do* envision a crime such as Aleo's[.]" *Id.* (emphasis added). Under the federal guidelines, Aleo's calculated sentence

included several enhancements that specifically addressed the unique characteristics of his offense. Four levels were added because Aleo produced child pornography with a minor under the age of twelve. Two levels were added because the offense involved the commission of a sexual act or sexual contact. Two levels were added because Aleo was a relative of the minor and the minor was in his custody, care, or supervisory control. Therefore, the guidelines expressly take into account a defendant who creates child pornography using a relative, when the relative was under the age of twelve, under the individual's supervision, and who the defendant sexually touched during the creation of the pornography. [*Id.*]

Accordingly, the Sixth Circuit concluded, the district court's belief that the guidelines did not contemplate Aleo's crime was incorrect, and did not serve as a "compelling justification" for the sentence imposed. *Id.* at 301.

The Sixth Circuit then considered the district court's "deterrence" explanation for the sentence, finding it lacking as the sentence imposed "threatens to cause disparities in sentencing, because it provides a top-of-the-range sentence for what is not a top-of-the-range offense." *Id.* The Court proceeded to review other cases involving defendants convicted of child pornography offenses involving grandparents. *Id.* In those cases, the defendants received far lighter sentences. *Id.* The Court observed, "There is no compelling justification for differentiating his offense so dramatically from theirs." *Id.* Aleo's crimes meaningfully differed from Vowell's, the Sixth Circuit elucidated, as Vowell had made three videotapes involving sexual contact with his girlfriend's child, two while she was drugged, engaged in oral-to-genital contact with the child, and attempted anal and genital penetration. *Id.* This was a "significantly worse crime[]," meriting the harsh punishment imposed. *Id.*

Aleo's sentence could not stand, the Sixth Circuit reasoned, because the district court failed to "reasonably distinguish Aleo from other sex offenders who molested young relatives[,]" and neglected to

> take into account why Aleo should receive the harshest possible sentence, even though he had not committed the worst possible variation of the crime. He had, for example, cooperated with authorities, admitted responsibility for his actions, and only committed one known offense involving sexual contact with a minor. There was no evidence that he drugged the child or committed more than brief sexual contact. While we share the district court's outrage at Aleo's acts, the justifications offered by the district court do not support the enormous variance beyond the guidelines range and the disparity with sentences of other, similar offenders. The sentence was substantively unreasonable. [*Id.* at 302.]

We draw from these two cases several helpful analytical guideposts. First, a sentence above or below the guidelines likely does not constitute an abuse of discretion if it is commensurate with the individualized, highly case-specific reasons supplied by the sentencing court as justifications for the departure. Sentencing courts are not precluded from imposing an above or below-guidelines sentence based on a disagreement with the guidelines, or by finding that the guidelines' range is too severe or too lenient. However, if the sentencing court relies on

such a disagreement when imposing sentence, the court must offer reasons "sufficiently compelling" to satisfy an appellate court that application of the guidelines would result in a sentence longer or shorter in length than would be just under the circumstances. *Gall*, 552 US at 50.

We envision that a federal-law inspired approach to Michigan departure sentencing would operate under the following principles. Procedurally, a sentencing court would make underlying factual findings carefully drawn from the record to properly calculate the guidelines, treating the guidelines as advisory only and not mandatory. The court would then consider the fundamental principles that have historically animated sentencing decisions in Michigan, and which roughly correspond to the factors listed in 18 USC 3553(a). Drawn from Michigan case law, those principles include proportionality, the potential for reformation or rehabilitation of the defendant, deterrence, the protection of society from further crimes by defendant, and the need to appropriately punish the defendant for the crimes of conviction while avoiding sentence disparities between similarly-situated defendants. This procedure equates with a federal trial court's consideration of 18 USC 2552(a) and the reasonableness principles and requirements articulated in *Gall*. A court's explanation of the reasons for departure must include sufficient detail to facilitate meaningful appellate review. A sentence fulfilling these criteria is procedurally reasonable.

Substantively, we believe that a sentencing court should be governed by the following principles and requirements: (1) the guidelines themselves supply the starting point or initial benchmark of the analysis; (2) extraordinary or exceptional circumstances are not required to justify a sentence outside of the guidelines; (3) no presumption of unreasonableness attends a departure sentence; (4) a rigid mathematical formula is not to be applied; (5) the sentencing court must engage in an individualized assessment on the basis of the facts presented, taking into consideration mitigating or aggravating factors and the totality of the circumstances;[8] (6) the extent of a departure must be considered and sufficiently justified, with a major departure supported by a more significant justification than a minor departure; (7) substantive findings regarding reformation or rehabilitation, society's protection, punishment, and deterrence can potentially support a departure; and (8) if sufficient and sound justification is presented, a court may depart from the guidelines on the basis of a disagreement with the guidelines, or by finding that a guidelines variable is given inadequate or disproportionate weight.[9] Ultimately, the touchstone of the departure analysis is reasonableness.

---

[8] The *Gall* Court observed that because the federal sentencing guidelines are no longer mandatory, the range of sentencing choices is significantly broadened as dictated by the facts of the case. *Gall*, 552 US at 59.

[9] With respect to reformation or rehabilitation, society's protection, punishment, and deterrence, "there is no requirement that the trial court expressly mention each . . . of [them] . . . when imposing sentence." *People v Rice*, 235 Mich App 429, 446; 597 NW2d 843 (1999). That said, it may be beneficial for a sentencing court to explore these areas on the record in order to facilitate appellate review of a sentencing departure.

As in the federal courts, we would anticipate that Michigan's guidelines encompass the vast majority of typical cases, or the territory referred to by the federal courts as the "heartland." While a court is not precluded from justifying a departure by relying on a fact already taken into account by the guidelines, the court must offer a sound and reasoned explanation for doing so. Such reasons may include but are not limited to that the guidelines afford inadequate or disproportionately harsh weight to the fact, or that the Legislature's assessment of the weight given to a factor is flawed for other reasons. A court may not haphazardly disregard or ignore the guidelines, especially given that they represent the benchmark of every sentence. See *Gall* 552 US at 49. But because the guidelines are now solely advisory, the inherent uniqueness of a case may guide a court seeking to depart. We further note that in *Aleo*, the Sixth Circuit took pains to point out that the district court neglected to consider any of the *mitigating* facts brought to its attention. A reasonable departure sentence—whether upward or downward—would reflect consideration of both aggravating and mitigating facts.

Finally, we reiterate that under the regime we propose, a trial court's careful and detailed articulation of its reasoning when imposing a departure sentence remains important. In this regard, we echo our Supreme Court's admonitions in *People v Smith*, 482 Mich 292, 304; 754 NW2d 284 (2008):

> [T]he trial court's justification "must be sufficient to allow for effective appellate review." . . . [I]f it is unclear why the trial court made a particular departure, an appellate court cannot substitute its own judgment about why the departure was justified. A sentence cannot be upheld when the connection between the reasons given for departure and the extent of the departure is unclear.

Were we free to apply the analysis we have sketched above to the facts of this case, our opinion would read as follows:

Pursuant to *Lockridge*, we review this departure sentence for reasonableness. *Lockridge*, __ Mich at __, slip op at 29. Informed by *Gall*, 552 US at 46, we apply an abuse-of-discretion standard. An abuse of discretion occurs when the court's decision falls outside the range of reasonable and principled outcomes. *Maldonado v Ford Motor Co*, 476 Mich 372, 388; 719 NW2d 809 (2006). A trial court that selects a principled outcome has not abused its discretion. *Id*.

Measured against the standards erected in *Gall* and *Kimbrough*, the trial court's explanation for defendant's departure sentence is more than adequate. The court considered the sentence called for under the guidelines, and explained in considerable detail why a harsher sentence was needed for someone who had committed the number of serious sex crimes as had defendant. The court highlighted the highly unusual circumstances presented in this case, particularly that defendant had abused three sisters, threatened all of them in different and terrifying ways, and used the complainants' deeply-held religious beliefs to both conceal and further his illicit behavior.

The trial court's observation that this was not an ordinary criminal sexual conduct case is well-supported by the record, as is the continuing emotional toll of defendant's misconduct endured by the three complainants. The guidelines do not take into account the seriousness of a

longstanding pattern of sex crimes committed against three minors living together in the same home, or a defendant who uses his position as a religious and cultural leader and simultaneously as an instructor in the complainants' family to perpetrate his abuse. The record is rife with evidence that defendant's sexual abuse of all three complainants devastated their teenage years, and triggered tragic emotional repercussions that have continued into their adulthood. It is obvious to us that in selecting its sentence, the trial court was motivated by the need to impose a sentence that truly fit defendant's crimes, rather than to sensationalize the surrounding circumstances or to appease community sentiments. Taking into account the totality of the circumstances, defendant's sentence is reasonable.

One further aspect of defendant's sentence requires discussion. Pre-*Lockridge*, trial courts were encouraged to justify the extent of a departure sentence by comparing the guidelines score of the defendant against "a hypothetical defendant whose recommended sentence is comparable to the departure sentence[.]" *Smith*, 482 Mich at 310. This exercise could be accomplished by judicial fact-finding to produce heightened offense or prior record variable scores when a court concluded that the variables inadequately account for the factual circumstances presented. The trial judge in this case followed this path, but then traveled beyond mere recalculation and offered a thoughtful explanation premised on noncontroversial aggravating factors that fully explained why an above-guidelines sentence was reasonable. As such, remand in this case is unnecessary.

In the future, we would caution courts that *exclusive* reliance on a guideline recalculation approach risks compounding the very problem identified in *Lockridge*: judicial fact-finding that increases a defendant's minimum sentence range violates the Sixth Amendment. The guidelines are simply that—guidelines. And under *Lockridge*, they are purely advisory. *Lockridge*, __ Mich at __, slip op at 28. Rather than relying on judicially found facts to increase offense variable scores, we encourage judges to detail the specific reasons that a case falls outside the mainstream, and that explain why the sentence imposed is more just than a within-guidelines sentence. Moreover, because Michigan's sentencing guidelines omit any provisions for mitigation, a reasonable downward departure sentence need not be rooted in a guidelines recalculation.

As we are bound by *Steanhouse*, however, we may not resolve the issue in this manner.

VII.

We respectfully disagree with the analysis set forth in *Steanhouse* for several reasons.

Generally speaking, the "principle of proportionality" plays a role in a reasonableness analysis conducted pursuant to *Gall*. We have no quarrel with the notion that sentencing courts should also consider "proportionality" before determining the extent of a departure sentence. In our view, however, the "principle of proportionality" described in *Milbourn* is but one concept that should figure into departure sentencing. Furthermore, applying the "principle of proportionality" to the exclusion of other concepts erodes a court's sentencing discretion. Finally, we believe that remand for a *Crosby* hearing in cases like that now before us unnecessarily complicates and prolongs the sentencing process.

-21-

Before the United States Supreme Court decided *Gall*, a number of federal courts had held that "[a]n extraordinary reduction [from the guidelines' range] must be supported by extraordinary circumstances." *United States v Burns*, 500 F3d 756, 761 (CA 8 2007), vacated and remanded 552 US 1137; 128 S Ct 1091; 169 L Ed 2d 804 (2008). See also *United States v Johnson*, 427 F3d 423, 426-427 (CA 7, 2005). As articulated in *Burns*: "[O]ur extraordinary reduction/extraordinary circumstances formulation requires circumstances of a strength proportional to the extent of the deviation from reductions envisioned by the guidelines' structure." *Burns*, 500 F3d at 761-762. "Extraordinary circumstances are infrequently found. . . .' " *Id*. at 763.

The Eighth Circuit's now-discredited approach in *Burns* corresponds to our Supreme Court's opinion in *Milbourn*, in which the Court decreed, "Where a given case does not present a combination of circumstances placing the offender in either the most serious or least threatening class with respect to the particular crime, then the trial court is not justified in imposing the maximum or minimum penalty, respectively." *Milbourn*, 435 Mich at 654. In *Milbourn*, the Supreme Court applied proportionality review in a manner strikingly similar to that utilized in *Burns*:

> In our discussion of proportionality, we observed that the Legislature has determined to visit the stiffest punishment against persons who have demonstrated an unwillingness to obey the law after prior encounters with the criminal justice system. Mr. Milbourn was a young man and, at the time the instant offense was committed, he had no criminal record. [*Id*. at 668.]

Respectfully, we observe that in *Milbourn*, the Supreme Court appeared to have weighed the facts de novo, despite having espoused an abuse of discretion standard of review. Referring to the appellate application of proportionality analysis, the Supreme Court in *Gall* noted that it "reflect[s] a practice of applying a heightened standard of review to sentences outside the Guidelines range, which is inconsistent with the rule that the abuse-of-discretion standard applies to appellate review of all sentencing decisions—whether inside or outside that range." *Gall*, 552 US at 39.

In *Gall*, the Supreme Court rejected proportionality review because it inhibited a sentencing court's discretion while simultaneously tethering the range of sentencing choices to the guidelines:

> An appellate court may take the degree of variance into account and consider the extent of a deviation from the Guidelines, but it may not require "extraordinary" circumstances or employ a rigid mathematical formula using a departure's percentage as the standard for determining the strength of the justification required for a specific sentence. *Such approaches come too close to creating an impermissible unreasonableness presumption for sentences outside the Guidelines range.* [*Gall*, 552 US at 38 (emphasis added).]

Indeed, proportionality review as applied in *Milbourn* undercuts our Supreme Court's holding in *Lockridge* that the guidelines are now truly advisory and not mandatory. In *Milbourn*, the

Supreme Court cabined a sentencing judge's discretion to depart by urging that the guidelines should almost always control:

> The guidelines represent the actual sentencing practices of the judiciary, and we believe that the second edition of the sentencing guidelines is the best "barometer" of where on the continuum from the least to the most threatening circumstances a given case falls.

> \* \* \*

> We believe that the gradation of recommended sentencing ranges within the guidelines indicates not only that the full statutory range of possible sentences is being used, but also that the recommended ranges increase as the factors that *are* adequately represented in the guidelines become more serious. For this reason, we believe that it is safe to assume that in the eyes of the vast majority of trial judges who have chosen to impose sentences within the guidelines ranges, the guidelines reflect the relative seriousness of different combinations of offense and offender characteristics. [*Milbourn*, 435 Mich at 656, 658.]

By contrast, the *Lockridge* Court repeatedly highlighted that its decision is rooted in the right to jury trial enshrined in the Sixth Amendment, *Lockridge*, __ Mich __; slip op at 6, 11, 16, and that the imposition of a mandatory minimum sentence predicated on judicial fact-finding violates the Sixth Amendment. *Id*. at 11. Because judge-found facts usually control guidelines' scoring, we question whether *Steanhouse* and *Lockridge* can be reconciled.

Additionally, we respectfully disagree with the *Steanhouse* Court's mandate that this Court remand cases involving sentencing decisions made pre-*Lockridge* pursuant to *Crosby*. In our view, this procedure unnecessarily complicates appellate review while unduly burdening trial courts. Given that the guidelines are now merely advisory and that even under *Steanhouse*, an abuse-of-discretion standard applies to appellate review, we suggest that the application of a reasonableness standard as outlined by the federal courts better comports with *Lockridge* and the Sixth Amendment.

VIII.

Lastly we consider defendant's claim that his 35-year minimum sentences constitute unconstitutionally cruel and unusual punishment because he will be 86 years old when his minimum sentences are completed. The United States Constitution prohibits cruel and unusual punishment, see US Const, Am VIII, and the Michigan Constitution prohibits cruel or unusual punishment, see Const 1963, art 1, § 16. "In deciding if punishment is cruel or unusual, this Court looks to the gravity of the offense and the harshness of the penalty, comparing the punishment to the penalty imposed for other crimes in this state, as well as the penalty imposed for the same crime in other states." *People v Brown*, 294 Mich App 377, 390; 811 NW2d 531 (2011). Defendant fails to demonstrate that his sentences are cruel or unusual by comparing them to the penalties imposed for other crimes in this state and the same crime in other states.

We affirm defendant's convictions but remand for further sentencing proceedings as we are bound to do so by *Steanhouse*.  We do not retain jurisdiction.


/s/ Elizabeth L. Gleicher
/s/ William B. Murphy