# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

ALPHONSO DERAY WALKER,

Defendant-Appellant.

UNPUBLISHED
December 13, 2016

No. 328864
Oakland Circuit Court
LC No. 2014-251471-FC

Before: JANSEN, P.J., and CAVANAGH and BOONSTRA, JJ.

PER CURIAM.

Defendant was convicted after a jury trial of robbery armed, MCL 750.529; unlawful imprisonment, MCL 750.349b; second-degree criminal sexual conduct (CSC-2), MCL 750.520c; assault with intent to do great bodily harm less than murder (AGBH), MCL 750.84; felon in possession of a firearm, MCL 750.224f; felonious assault, MCL 750.82; and six counts of felony firearm - second offense, MCL 750.227b. He was sentenced to 37½ to 60 years' imprisonment for the armed robbery conviction, to 25 to 60 years' imprisonment for the unlawful imprisonment, CSC-2, AGBH, and felon in possession convictions, to 46 months to 15 years' imprisonment for the felonious assault conviction, and to six terms of five years' imprisonment for the felony firearm convictions that were mandatorily consecutive to each of the underlying convictions based on the statutory enhancement for a second conviction, MCL 750.227b(1). Defendant appeals as of right, claiming that he was prejudiced by the delay in his arrest, that he received ineffective assistance of counsel, and that his sentence was unreasonable. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On December 21, 2012, defendant asked the victim to go to his former residence and wait there for a man who was coming to inspect the house before renting it. Because the victim knew defendant and his family, she agreed to do so. The victim's mother drove her from defendant's current home on Cedardale Avenue to his former house on Linda Vista Drive in Pontiac, Michigan, where defendant was waiting for them in his daughter's car. They agreed that the victim would call her mother when she was ready to be picked up. The victim's mother saw the two of them walk into the house and then she drove away.

The victim testified that she and defendant entered the empty house and that defendant brought a piece of a sectional sofa upstairs from the basement so that she would have someplace

-1-

to sit while she waited. Defendant then left after telling her that he would be close by and to call him when the man showed up.

The victim brought along a laptop bag containing her laptop computer, a notebook, her black Coach purse, an iPod, and her cell phone. She spent about an hour using her laptop computer and smoking some marijuana before defendant returned. Defendant asked her to call her mother and tell her that he was bringing her back to his home on Cedardale, and she did so. Her mother testified that she called around 1:27 p.m. and said that she was ready to go and that "they" were driving to the Cedardale house. The victim's mother was at home when she received this call so she drove to the Cedardale house to wait.

Before they left the Linda Vista house, defendant started taking the sectional sofa back downstairs, but it got stuck in the door, so he asked the victim to help him. She assisted him in getting the couch back in the basement, which was covered in water; defendant explained that he was draining the hot water heater. They moved the couch to a drier part of the basement floor and when they placed it down, the victim turned to find defendant pointing a black handgun at her; he said that "when I see one of these I should know it's a stick up." At first, she thought he was "showing off," but he started hitting her, punching her in the face and striking her with the butt of the gun. Defendant also grabbed her braids and tried to turn her around so that she would be straddling the couch facing away from him, but she struggled to keep him from doing so. She kept asking him, "Why are you doing this? We know you, you know us. What are you doing this for? You don't have to do this." Defendant responded: "Bitch, you think I'm playing? This is a stick up! You think I'm playing with you?" The victim indicated that he was either holding the handgun or that it was nearby on the basement floor while this struggle was taking place. At one point, he shot the gun; the victim thought he shot it in her direction but acknowledged having told the police that he shot the gun into the basement floor.

While they were struggling, defendant was pulling the victim's clothes off until she was wearing only her panties. He began searching her body, touching her breasts, and asking if she had any money. He dragged her into a bathroom, reached into her vagina, and pulled out a tampon, saying: "Now I have to tell my wife I touched your p---y." Thinking that it might get him away from her, the victim, who was menstruating, told defendant she had fresh tampons in her purse and he went upstairs to get one. He found a used tampon in her purse that she had intended to dispose of later, so he accused her of lying and started beating her again.

Defendant was choking the victim, pulled her back and forth through the water on the basement floor, put her face in the water, covered her head with her coat and kicked her in her side, pulled her hair, wrapped her braid around her neck, wrapped her bra and her scarf around her neck, strangling her, and wrapped his tie tightly around her neck. She coughed up bloody phlegm and blacked out.

Defendant then shut the victim in the basement bathroom. She thought he had walked away, but when she opened the door, he was standing there pointing the gun at her. He told her to sit on the toilet and then used her scarf to tie her to the toilet. She complained that she was cold, so he threw her hoodie and a blanket at her.

The victim heard defendant walking around upstairs, and then she heard a door close, so she thought he had left the house. She worked her hands free, forced the bathroom door open, grabbed the blanket, and ran upstairs and out of the house through the back door. On her way out, she noticed that her purse and other personnel items were gone. As she ran toward the street, she saw defendant sitting in his car, which was backed into the driveway. Defendant got out of the car with the gun in his hand and began chasing her. She began screaming and yelling as she ran away from him. The first person she saw said she would call the police but otherwise declined to help, so she continued running. Defendant caught up with her, grabbed the blanket off of her, and kept repeating, "Give me the dope! Give me the money! Where's your money!" The victim responded, "You have everything, my purse, you have everything!" She continued to run until a woman invited her inside and called the police. Ultimately, the victim was taken to the hospital where she remained for three days. Among other injuries, she was in great pain, her eyes were red and swollen so that she could not see, she could hardly hear, she could not breathe out of her nose, she had bruises on her face and body, and some of her hair had been pulled out.

The victim's mother testified that she grew concerned when defendant and her daughter had not returned to the Cedardale home, so she called her daughter's cell phone but the call went straight to voice mail. She then called defendant's cell phone and he answered in a panicked voice. He claimed that that they had been robbed, he had been shot, and her daughter had run off down the street.

The police examined the Linda Vista house and discovered what appeared to be blood by the back door handle and on the kitchen tile floor. In the basement they found several inches of water, blood on the bathroom walls, and what appeared to be a bullet hole in the wall; however, they did not find a bullet. They found two gold earrings on the floor, along with a tampon and tampon wrapper, and more blood.

The police were unable to locate defendant, but they did locate the car he had been driving. They noticed what appeared to be blood on the steering wheel and on the driver's side door jamb. In the trunk they located the victim's purse and a wet blanket. Over the succeeding 18 months, the police kept several homes associated with defendant under periodic surveillance, spoke with neighbors, and questioned his family, but they were denied permission to search the Cedardale home and they could not locate defendant. Finally, in June of 2014, defendant was apprehended after he was found riding a bicycle near the Cedardale home.

At trial, defendant testified that the victim had arranged to have a Federal Express package delivered to the house on Linda Vista and that she had asked him to meet her there. Defendant claimed that shortly after the victim arrived she began complaining of menstrual cramps so he drove back to the Cedardale house to get something for the pain. He said that on the way the victim insisted on being taken back to the Linda Vista house because she was afraid she would miss delivery of the package. When they returned, she insisted on going inside and since he did not have the keys given that the home had been foreclosed and he no longer owned it, she broke the glass on the back door and entered. Defendant claimed he drove back to the Cedardale home, obtained Motrin, and returned to the Linda Vista home to find the victim by the side of the house wearing a blanket. He denied hitting her with a gun, firing a gun, pulling a tampon out of her or doing anything bad to her. He explained that the law prohibited him for having a gun and he denied having one on that date. He said he had no idea how her purse had

gotten into the trunk of the car he had been driving. He denied stealing the purse or any of the electronic equipment or holding a gun on her and demanding drugs or money. He further denied calling the victim's mother and telling her that they had been robbed and shot at.

Defendant suggested that the victim and her mother were making the whole story up because they did not want anyone to know that they were receiving the Fed Ex package. Defendant produced a Fed Ex ticket that showed a delivery (or attempted delivery) on December 20, 2012, the day before the incident. He claimed he obtained the ticket when he went to the Linda Vista home to pick up some mail that was still being delivered to that location. Defendant also presented a "relocation agreement" that he claimed established that he had an agreement with a realtor to clean out and vacate the foreclosed Linda Vista home in return for the payment of $1,250. The prosecutor objected to this agreement and it was not admitted into evidence.

## II. ANALYSIS

### A. DELAY IN ARREST

Defendant first claims that the approximate 18-month delay by the police in effecting an arrest in this case violated his rights to due process, to a fair trial, to present a defense, and to confront the witnesses and evidence against him. This claim is without merit.

Defendant acknowledges that he failed to raise this issue in the trial court and therefore it is not preserved. See *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999); *People v Musser*, 259 Mich App 215, 219-220; 673 NW2d 800 (2003). This Court's review of unpreserved issues is limited to plain error that affects a defendant's substantial rights. *Carines*, 460 Mich at 763; *Musser*, 259 Mich App at 220. This requires a defendant to show that (1) error occurred, (2) the error was plain, that is, clear or obvious, and (3) that the plain error affected the defendant's substantial rights. "The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Carines*, 460 Mich at 763.

In *United States v Marion*, 404 US 307; 92 S Ct 455; 30 L Ed 2d 468 (1971), the United States Supreme Court rejected the defendants' attempt to apply speedy trial case law to the three-year delay between the commission of the crime and the date of their indictment. The Court made clear that because neither defendant had been "arrested, charged, or otherwise subjected to formal restraint prior to indictment, they were not "subject to the speedy trial protections of the Sixth Amendment." *Id*. at 325. The Court concluded:

No actual prejudice to the conduct of the defense is alleged or proved, and there is no showing that the Government intentionally delayed to gain some tactical advantage over appellees or to harass them. Appellees rely solely on the real possibility of prejudice inherent in any extended delay: that memories will dim, witnesses become inaccessible, and evidence will be lost. In light of the applicable statute of limitations, however, these possibilities are not in themselves enough to demonstrate that appellees cannot receive a fair trial and to therefore justify the dismissal of the indictment. Events of the trial may demonstrate actual

prejudice, but at the present time appellees' due process claims are speculative and premature. [*Id*. at 325-326.]

In *United States v Lovasco*, 431 US 783; 97 S Ct 2044; 52 L Ed 2d 752 (1977), the Supreme Court explained that the last sentence of the passage quoted from *Marion* "establishe[d] only that proof of actual prejudice makes a due process claim concrete and ripe for adjudication, not that it makes the claim automatically valid." The Court rejected the defendant's assertion that the government was required to indict him as soon as it had probable cause to seek the indictment or at least when it had sufficient evidence to convict him beyond a reasonable doubt. The Court held that this was not the standard required by the Due Process Clause and concluded that "to prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time." *Lovasco*, 431 US at 796.

In *Musser*, a case involving a 13-month delay between the offense and the defendant's arrest, this Court held:

> In order to demonstrate a violation of the right to due process on the basis of preindictment or prearrest delay, a defendant must show actual and substantial prejudice to his right to a fair trial. A general claim that the memories of witnesses have suffered is insufficient to demonstrate prejudice. [*Musser*, 259 Mich App at 220 (citations omitted).]

In *People v Woolfolk*, 304 Mich App 450; 848 NW2d 169 (2014), a case involving a delay of nearly five years, this Court similarly observed:

> A prearrest delay that causes substantial prejudice to a defendant's right to a fair trial and that was used to gain tactical advantage violates the constitutional right to due process. Defendant must present evidence of actual and substantial prejudice, not mere speculation. A defendant cannot merely speculate generally that any delay resulted in lost memories, witnesses, and evidence . . . even if the delay was an especially long one . . . . [*Id*. at 454 (citations omitted).]

In this case, defendant claims the almost 18-month delay between the offense and the arrest prejudiced him in two ways: first, it prevented him from being able to prove that he had entered into a relocation agreement to establish that the Linda Vista house was no longer his, and second, he was unable to obtain evidence or witnesses from Fed Ex to establish that the victim had arranged to have a package delivered to the Linda Vista address. Defendant has not claimed that the police or prosecution intentionally delayed his arrest in order to gain some tactical advantage. Instead, he appears to claim that an earlier arrest would have made it easier for him to obtain evidence regarding the relocation agreement and the Fed Ex delivery.

Defendant has failed to establish that the passage of time prevented him from obtaining evidence or witnesses to prove these claims. Indeed, defendant presented a document that purported to be a relocation agreement (although he could not establish a legal basis for its admission into evidence), and he also presented a delivery ticket that purported to show delivery of the Fed Ex package (or at least an attempt to deliver that package) on the day before the

charged offenses occurred. He was also able to get the victim to admit that she observed a Fed Ex package on the front porch. Defendant has not specifically indicated what other evidence he could have obtained had he been arrested earlier; at best, he only speculates that he could have obtained "witnesses" from the real estate firm that entered into the relocation agreement or from Fed Ex.

More importantly, defendant has failed to explain how establishing the existence of the relocation agreement, or demonstrating that the Fed Ex package delivery was arranged by the victim, would have resulted in acquittal. The prosecution did not dispute that defendant no longer lived in the Linda Vista house. The evidence showed that the house was empty. The prosecution agreed that defendant and his wife lived in the home on Cedardale. Defendant's defense at trial was that he did not ask the victim to go to the Linda Vista house to wait for a prospective renter to show up, presumably because he no longer owned the house and would have had no reason to be showing the house to a renter. He claimed that the victim asked him to take her to the house so she could get a Fed Ex package that was to be delivered to that address. Defendant apparently wanted to suggest that there must have been some unknown person who met the victim at the house (or who had already been waiting inside) and who beat her, perhaps because of the contents of the Fed Ex package. This is all pure speculation.

Moreover, even assuming there was a relocation agreement and the victim was awaiting a Fed Ex package, this would not establish that someone other than defendant beat the victim. She graphically described the beating she received from defendant. Evidence that defendant did not own the Linda Vista home (which was not disputed) and that the victim had requested delivery of a Fed Ex package to that address (if true) did not negate the incontrovertible facts that she was severely beaten, that the scene at the home supported her claim that she was beaten there, that her purse was found in the trunk of the car defendant had been driving along with the wet blanket she said had been given to her by defendant (and which he later retrieved as he chased her down the street), that her mother supported her explanation of why she had gone to the Linda Vista house and her claim that she and defendant had gone into the house together, and that as she was being loaded into an ambulance she unequivocally and immediately named defendant as her assailant and the man who took her property. Nor would it explain why defendant evidently hid from the police for almost 18 months or why he initially denied his identity when he was finally apprehended. Thus, defendant has not presented evidence of actual and substantial prejudice and has merely speculated generally that the passage of time affected his ability to locate witnesses or evidence.

In seeking to excuse his failure to make a factual record regarding his claims, defendant argues that his counsel failed to provide effective assistance by obtaining the evidence to support these claims. As our Supreme Court summarized in *People v Carbin*, 463 Mich 590, 599-600; 623 NW2d 884 (2001):

> A defendant seeking a new trial on the ground that trial counsel was ineffective bears a heavy burden. To justify reversal under either the federal or state constitutions, a convicted defendant must satisfy the two-part test articulated by the United States Supreme Court in *Strickland v Washington*, 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984). See *People v Pickens*, 446 Mich 298, 302-303; 521 NW2d 797 (1994). "First, the defendant must show that counsel's

-6-

performance was deficient. This requires showing that counsel made errors so serious that counsel was not performing as the 'counsel' guaranteed by the Sixth Amendment." *Strickland*, *supra* at 687. In so doing, the defendant must overcome a strong presumption that counsel's performance constituted sound trial strategy. *Id*. at 690. "Second, the defendant must show that the deficient performance prejudiced the defense." *Id*. at 687. To demonstrate prejudice, the defendant must show the existence of a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. *Id*. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. Because the defendant bears the burden of demonstrating both deficient performance and prejudice, the defendant necessarily bears the burden of establishing the factual predicate for his claim. See *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999).

Even if counsel had been able to establish that there was a relocation agreement or that the victim had placed the Fed Ex order, that would not have shown that defendant did not beat her, threaten her, touch her sexually, discharge a gun at her, confine her, or steal her property. Therefore, defendant has not established the first prong of the *Strickland* test because he failed to show that his counsel made a serious error. And defendant has not satisfied the second prong of the test because he failed to prove that, if counsel did make a serious error, there was a reasonable probability that the result of the trial would have been different.[1]

Finally, as this Court has held in both *Musser*, 259 Mich App at 221, and *Woolfolk*, 304 Mich App at 457, defendant's failure to establish actual and substantial prejudice means that defendant's delay-in-arrest claim is meritless. Counsel is not ineffective for failing to raise a meritless motion. *People v Comella*, 296 Mich App 643, 655; 823 NW2d 138 (2012).

B. REASONABLENESS OF SENTENCE

Defendant also claims that this Court must remand this case to the trial court for resentencing pursuant to *People v Lockridge*, 498 Mich 358; 870 NW2d 502 (2015), and further claims that the sentence imposed by the trial court was disproportionate. These claims are without merit.

Defendant raised this issue in the trial court by filing a motion for resentencing. The trial court considered defendant's motion and ruled:

---

[1] Furthermore, we note that defendant represented himself in this case with his trial counsel merely having advisory status. Defendant did not make any motion for the court's assistance in securing evidence of the relocation agreement or concerning the Fed Ex package delivery. There is no evidence that he requested that his advisory counsel undertake these tasks (beyond anything that was done to produce those documents in the first place) or that he sought the court's assistance in compelling counsel to undertake these tasks.

The court does agree that based upon *Lockeridge* [sic] that the defendant is entitled to resentencing, however, based upon the testimony that came out during the trial in this matter this court would not have changed the sentence – would not change the sentence that it's already given to this defendant. The crime was a horrendous one. It was a very assaultive crime and to be perfectly honest, considering the defendant's record and the fact that he has already been to prison, I really don't think that he is an individual that is capable of rehabilitation and because of that, I would still sentence him to the 37 and ½ years.

This issue is therefore preserved for appeal. See MCL 769.34(10); *People v Hershey*, 303 Mich App 330, 333, 354; 844 NW2d 127 (2013).

This Court reviews the trial court's sentence to determine if it is reasonable. *Lockridge*, 498 Mich at 392. Currently, controlling authority from this Court requires that determinations of the reasonableness of a particular sentence are made by applying the principle of proportionality. *People v Steanhouse*, 313 Mich App 1, 46-47; 880 NW2d 297 (2015), lv grt'd 499 Mich 934 (2016). Under this standard of review, "a given sentence [could] be said to constitute an abuse of discretion if that sentence violate[d] the principle of proportionality, which require[d] sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender." *Steanhouse*, 313 Mich App at 45, quoting *People v Milbourn*, 435 Mich 630, 636; 461 NW2d 1 (1990).

In his motion for resentencing, defendant did not engage in a detailed review of the Offense Variables that he contends were scored based on judicial fact-finding; nor does he engage in such a review in his appellate brief. Additionally, defendant has not filed, and the electronic record does not include, a copy of the Sentencing Information Report. This Court would be justified in declining to review defendant's claim concerning the trial court's departure from the sentencing guidelines because of defendant's failure to adequately present or argue this claim. See *People v Jones (On Rehearing)*, 201 Mich App 449, 456-457; 506 NW2d 542 (1993). Nevertheless, because defendant's original sentence occurred before the release date of the *Lockridge* decision, and because our Supreme Court has granted leave to determine the correct standard of review to be applied to reasonableness claims, we will review defendant's argument.

Our Supreme Court in *Lockridge* concluded that Michigan's legislative sentencing guidelines violated the rule in *Apprendi v New Jersey*, 530 US 466; 120 S Ct 2348; 147 L Ed 2d 435 (2000), as extended by *Alleyne v United States*, 570 US __; 133 S Ct 2151; 186 L Ed 2d 314 (2013). The Court found a constitutional deficiency based on "the extent to which the guidelines *require* judicial fact-finding beyond facts admitted by the defendant or found by the jury to score offense variables (OVs) that *mandatorily* increase the floor of the guidelines minimum sentence range, i.e., the "mandatory minimum" sentence under *Alleyne*." *Lockridge*, 498 Mich at 364 (emphasis in original). Our Supreme Court concluded:

To remedy the constitutional violation, we sever MCL 769.34(2) to the extent that it makes the sentencing guidelines range as scored on the basis of facts beyond those admitted by the defendant or found by the jury beyond a reasonable doubt mandatory. We also strike down the requirement in MCL 769.34(3) that a sentencing court that departs from the applicable guidelines range must articulate

a substantial and compelling reason for the departure. [*Lockridge*, 498 Mich at 364-365 (footnote omitted).]

Our Supreme Court then considered what relief should be afforded in various situations. Assuming, for purposes of this appeal, that defendant correctly claims that the court engaged in judicial fact-finding to score the sentencing guidelines, this case would involve the second scenario considered by the Court:

> cases in which facts admitted by a defendant or found by the jury verdict were *insufficient* to assess the minimum number of OV points necessary for the defendant's score to fall in the cell of the sentencing grid under which he or she was sentenced. In those cases, it is clear from our previous analysis that an unconstitutional constraint actually impaired the defendant's Sixth Amendment right. The question then turns to which of these defendants is entitled to relief, i.e., which can show plain error.

> We conclude that all defendants (1) who can demonstrate that their guidelines minimum sentence range was actually constrained by the violation of the Sixth Amendment and (2) whose sentences were not subject to an upward departure can establish a threshold showing of the potential for plain error sufficient to warrant a remand to the trial court for further inquiry. [*Lockridge*, 498 Mich at 395 (emphasis in original).]

In cases where a remand is ordered,[2] the trial court must "determine whether [it] would have imposed a materially different sentence but for the constitutional error." *Lockridge*, 498 Mich at 397. In this case, assuming that judicial fact-finding was used to score the sentencing guidelines, and assuming for the sake of this appeal that the sentencing guidelines should have been scored so as to result in a lower minimum sentence range, there was an upward departure from the correctly scored sentencing guidelines minimum sentence range. However, a remand is not necessary because the purpose of the remand has already been accomplished by the trial court's consideration of defendant's motion for resentencing. The trial court has determined that, even without consideration of the sentencing guidelines, it would have imposed the same sentence. Therefore, the court, in effect, ruled that the sentencing guidelines did not impose an unconstitutional constraint on its sentencing discretion because, even had the guidelines been calculated for a lesser range, the court would *still* have imposed the same (greater) sentence. In such circumstances, the court's sentence would have been an upward departure, and the *Lockridge* Court held that an upward departure did not constitute plain error. *Lockridge*, 498 Mich at 395 n 31. The purpose of a *Lockridge* remand is to provide the sentencing court with the opportunity to resentence the defendant or to affirm the previously imposed sentence; this

---

[2] Our Supreme Court held that a *Crosby* remand (*United States v Crosby*, 397 F3d 103 (CA 2, 2005)), would only be required in cases in which the sentencing occurred before the July 29, 2015 date of the *Lockridge* decision. *Lockridge*, 498 Mich at 397. The original sentencing in this case occurred before the date of the *Lockridge* decision; however, the purpose of the *Crosby* remand was satisfied by the hearing on defendant's motion for resentencing.

purpose having been served in this case by the trial court's decision on defendant's motion for resentencing, there is no reason for this Court to order a remand.

Defendant additionally claims that his sentence is unreasonable and disproportionate. The remaining issue, then, is to determine if the sentence that was imposed was appropriate. Our Supreme Court held in *Lockridge*, 498 Mich at 392, that a court may exercise its discretion to depart from the applicable guidelines range and "[a] sentence that departs from the applicable guidelines range will be reviewed by an appellate court for reasonableness." The Court added: "Resentencing will be required when a sentence is determined to be unreasonable." *Id.* However, the *Lockridge* Court did not decide what standard should be applied to determine whether a particular sentence is unreasonable.

This Court has proposed two different standards of review. In *Steanhouse*, 313 Mich at 46-47, this Court concluded that the proper standard to use is the "principle of proportionality" standard that was previously applied by our Supreme Court in *Milbourn*, 435 Mich at 636. This Court set forth a non-exclusive list of factors that had been

> previously considered by Michigan courts under the proportionality standard includ[ing], among others, (1) the seriousness of the offense, . . .; (2) factors that were inadequately considered by the guidelines, . . . ; and (3) factors not considered by the guidelines, such as the relationship between the victim and the aggressor, . . .; the defendant's misconduct while in custody, . . .; the defendant's expressions of remorse, . . .; and the defendant's potential for rehabilitation, . . . . [*Steanhouse*, 313 Mich App at 46 (citations omitted).]

With regard to the trial court's refusal to grant resentencing in this case, the court justified its decision to affirm its previous sentence by noting that "based upon the testimony that came out during the trial," "[t]he crime was a horrendous one. It was a very assaultive crime and to be perfectly honest, considering the defendant's record and the fact that he has already been to prison, I really don't think that he is an individual that is capable of rehabilitation . . . ." Thus, the trial court clearly considered "the seriousness of the offense" and "the defendant's potential for rehabilitation" in deciding that it would not grant a resentencing. The evidence presented at the trial, in particular, the evidence regarding the injuries inflicted on the victim, justified the trial court's sentencing decision. Therefore, when the principle of proportionality standard adopted by *Steanhouse* is applied, the trial court's sentence should be affirmed as reasonable.

This Court has also decided, in *People v Masroor*, 313 Mich App 358, 361; 880 NW2d 812 (2015), lv grt'd 499 Mich 934 (2016), that if it were not bound by the *Steanhouse* decision, it would adopt the federal "reasonableness" standard as articulated in *Gall v United States*, 552 US 38, 46; 128 S Ct 586; 169 L Ed 2d 445 (2007). The Supreme Court in *Gall* explicitly recognized that "the familiar abuse-of-discretion standard of review now applies to appellate review of sentencing decisions." 552 US at 46. Explaining how this standard would operate in the context of the Michigan Sentencing Guidelines, the *Masroor* Court stated:

> Substantively, we believe that a sentencing court should be governed by the following principles and requirements: (1) the guidelines themselves supply the starting point or initial benchmark of the analysis, (2) extraordinary or

exceptional circumstances are not required to justify a sentence outside of the guidelines, (3) no presumption of unreasonableness attends a departure sentence, (4) a rigid mathematical formula is not to be applied, (5) the sentencing court must engage in an individualized assessment on the basis of the facts presented, taking into consideration mitigating or aggravating factors and the totality of the circumstances, (6) the extent of a departure must be considered and sufficiently justified, with a major departure supported by more significant justification than a minor departure, (7) substantive findings regarding reformation or rehabilitation, society's protection, punishment, and deterrence can potentially support a departure, and (8) if sufficient and sound justification is presented, a court may depart from the guidelines on the basis of a disagreement with the guidelines, or by finding that a guidelines variable is given inadequate or disproportionate weight. Ultimately, the touchstone of the departure analysis is reasonableness. [*Masroor*, 313 Mich App at 392 (footnotes omitted).]

Again, the trial court's sentence would survive review under the *Masroor* standard. The trial court initially scored the sentencing guidelines and then determined an appropriate sentence. When it determined, in response to defendant's resentencing motion, that it would not change its initial sentence, the court noted the factors that caused it to affirm that sentence: this case presented a particularly serious physical attack, and defendant's prior record and his prior exposure to prison convinced the court that defendant's likelihood of rehabilitation was minimal. These were legitimate sentencing considerations that justified a significant departure from the minimum sentence range (assuming that defendant's claim that the sentencing guidelines were incorrectly scored is valid).

Our Supreme Court granted leave in *Steanhouse* and *Masroor* to settle this issue, specifically directing the parties to address four issues including: "what standard applies to appellate review of sentences following the decision in *People v Lockridge*." *People v Steanhouse*, 499 Mich 934; 879 NW2d 252 (2016). At this time, however, this Court is bound to follow its prior decision in *Steanhouse*. MCR 7.215(C)(2). We conclude that the trial court justified the reasonableness of its sentence when it denied defendant's motion for resentencing, and the evidence considered and cited by the trial court demonstrates that the sentence was reasonable; that is, the sentence was "proportionate to the seriousness of the circumstances surrounding the offense and the offender." *Milbourn*, 435 Mich at 636; *Steanhouse*, 313 Mich App at 45.

Defendant has failed to demonstrate the necessity for a remand for resentencing where the trial court has already addressed the propriety of the sentence as a result of defendant's motion for resentencing and has denied the motion because, even after applying the *Lockridge* decision, it would affirm its original sentence. Furthermore, defendant has failed to demonstrate that his sentence is unreasonable where the trial court stated its reasons for affirming its original

sentence, those reasons are supported by the evidence adduced at trial, and the sentence is proportionate.

Affirmed.

/s/ Kathleen Jansen
/s/ Mark J. Cavanagh
/s/ Mark T. Boonstra