# STATE OF MICHIGAN

# COURT OF APPEALS

---

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

V

CORY IVAN RIMSON,

      Defendant-Appellant.

UNPUBLISHED
June 29, 2017

No. 330578
Wayne Circuit Court
LC No. 15-001675-01-FC

---

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

V

VICTORIA JOAN FOSTER,

      Defendant-Appellant.

No. 331148
Wayne Circuit Court
LC No. 15-001675-02-FC

---

Before: MARKEY, P.J., and METER and SHAPIRO, JJ.

PER CURIAM.

These consolidated appeals[1] follow the criminal trial of two defendants arising from the death of seven-year-old Immanuel Foster (Immanuel).[2] In Docket No. 330578, defendant Cory Ivan Rimson (Rimson) appeals as of right his jury trial convictions of involuntary manslaughter, MCL 750.321, and second-degree child abuse, MCL 750.136b(3).[3] The trial court sentenced

---

[1] *People v Rimson*, unpublished order of the Court of Appeals, entered January 27, 2016 (Docket No. 330578).

[2] Immanuel was also known as "Manny."

Rimson to serve concurrent sentences of 10 to 15 years' imprisonment for involuntary manslaughter and 5 to 10 years' imprisonment for second-degree child abuse. We affirm Rimson's convictions and sentences.

In Docket No. 331148, defendant Victoria Joan Foster (Foster) appeals by right her jury trial convictions of involuntary manslaughter, first-degree child abuse, MCL 750.136b(2), and torture, MCL 750.85.[4] The trial court sentenced Foster to concurrent terms of 5 to 15 years' imprisonment for involuntary manslaughter and 27 to 50 years' imprisonment for both first-degree child abuse and torture. We likewise affirm Foster's convictions and sentences.

## I. FACTS

On October 23, 2014, an ambulance was summoned to a home on Richton Street in Detroit. Upon arrival, a paramedic found Immanuel lying on the floor in a pool of his own vomit, naked, unresponsive and cool to the touch. Immanuel appeared malnourished. Despite resuscitation efforts in the ambulance and upon his arrival at a local hospital, Immanuel died that morning.

Two expert witnesses testified at trial regarding Immanuel's injuries and cause of death. The prosecutor's expert, Dr. Carl Schmidt, described Immanuel as malnourished and somewhat dehydrated. Immanuel had 57 different injuries over his body. He had abrasions above his eye, on his cheek, and under his jaw, none of which appeared accidental; bruises to his arm were likely caused by being forcibly grasped under the armpit; and patterned bruises in lateral lines across his chest appeared to be the result of having been struck with an object, shown through other testimony, to have been a belt wielded by Rimson. Immanuel's body also contained numerous ulcerative lesions, or bedsores, which indicated he had been restrained or immobilized for some time before his death. One lesion in particular, located on Immanuel's right femur, was large and appeared to have scabbed and healed repeatedly. Based on the presence of scar tissue, Schmidt opined that the initial injury occurred over six weeks before Immanuel's death.

Schmidt described Immanuel as "cachectic," meaning that he was "wasting away . . . ." Schmidt described Immanuel's state as similar to that seen in the terminal stages of cancer. Schmidt believed that Immanuel likely contracted a respiratory infection at some point before his death, most likely because of his malnutrition and resulting inability to fend off the infection. The infection was not treated and was allowed to progress to pneumonia. This led to sepsis and ultimately, Immanuel's death. Immanuel's body showed several signs of the infection. Abscesses were found in his heart, lungs, and kidneys. Immanuel's feet were black. Several of Immanuel's toes were necrotic, i.e., the tissue was dead as the result of emboli, clots of pus that migrated from these abscesses to Immanuel's toes. In Schmidt's opinion, Immanuel's condition

---

[3] Rimson was charged with first-degree felony murder, MCL 750.316(1)(b). The jury found Rimson not guilty of murder, but guilty of involuntary manslaughter. Rimson was charged with first-degree child abuse, MCL 750.136b(2), but found guilty of second-degree child abuse. Rimson was found not guilty of torture, MCL 750.85.

[4] Like Rimson, Foster was charged with first-degree felony murder but was found guilty of involuntary manslaughter.

would have been easily visible to anyone who saw him. With regard to Immanuel's feet, Schmidt believed the process of the toes' dying took weeks and would have been "exquisitely painful." Schmidt classified the death as a homicide.

Defendants' expert, Dr. Ljubisa Dragovic, reached similar conclusions, but disagreed with some of Schmidt's testimony. Dragovic's most important disagreement was with whether the death was a homicide. Dragovic would have classified the death as undeterminable, believing that this was a case of "neglect resulting from ignorance."

Several other witnesses testified regarding the condition of Rimson's home, in where Immanuel was found, and Immanuel's activities before his death. Rimson and Foster were charged with first-degree felony murder, MCL 750.316(1)(b), first-degree child abuse, and torture. Rimson and Foster were tried together but before separate juries. The juries returned verdicts as explained at the outset of this opinion. The trial court sentenced both defendants to minimum sentences exceeding the range provided by the statutory sentencing guidelines, MCL 777.1 *et seq*. Rimson and Foster each appeal by right.

## II. DOCKET NO. 330578

### A. OFFENSE VARIABLE 3

Rimson's first issue on appeal challenges the trial court's assessment of 100 points to offense variable (OV) 3. We agree that the trial court erred by assessing 100 points for this variable; however, because correcting the error does not alter Rimson's sentencing guidelines range, no relief is warranted.

As our Supreme Court has explained:

Under the sentencing guidelines, the circuit court's factual determinations are reviewed for clear error and must be supported by a preponderance of the evidence. Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo. [*People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013).]

OV 3 considers "physical injury to a victim." MCL 777.33(1). A trial court must assign 100 points to the variable if a victim is killed *and the sentencing offense is not a homicide*. MCL 777.33(2)(b). See also *People v Houston*, 473 Mich 399, 405; 702 NW2d 530 (2005) ("The Legislature expressly prohibited the assessment of one hundred points when, as here, the underlying offense is homicide").

Over the objection of both the prosecutor and Rimson's counsel, the trial court concluded that the sentencing offense, involuntary manslaughter, was not a homicide. The trial court was incorrect. Under the sentencing guidelines, a homicide is "any crime in which the death of a human being is an element of that crime." MCL 777.1(c). Clearly, death is an element of involuntary manslaughter. *People v Datema*, 448 Mich 585, 594-595; 533 NW2d 272 (1995) (explaining that involuntary manslaughter is a "catch-all" concept that encompasses every unintentional killing of a human being that "is neither murder nor voluntary manslaughter nor

within the scope of some recognized justification or excuse." (quotation omitted)). Because death is an element of involuntary manslaughter, it is a homicide as that term is used when scoring the sentencing guidelines. MCL 777.1(c). Accordingly, the trial court clearly erred by assigning 100 points to OV 3. MCL 777.33(2)(b). The trial court should have assigned 25 points to this variable. Under OV 3, the next-highest applicable score is 25 points, which is warranted here because there is no doubt that a "[l]ife threatening or permanent incapacitating injury occurred to a victim." MCL 777.33(1)(c); see also *Houston*, 473 Mich at 406-407.

The prosecutor is correct, however, in arguing that this particular error does not warrant relief. "Where a scoring error does not alter the appropriate guidelines range, resentencing is not required." *People v Francisco*, 474 Mich 82, 89 n 8; 711 NW2d 44 (2006). In this case, the applicable scoring grid is found in MCL 777.64, which applies to class C felonies such as involuntary manslaughter. See MCL 777.16p. Any OV score of at least 75 points places a defendant in column F of this grid, the highest column available. As scored by the trial court, Rimson's total OV score was 190 points. Removing 75 points would still leave Rimson with an OV score exceeding 75 points. Thus, the error does not alter Rimson's guidelines range, and no relief is warranted due to the trial court's error. *Francisco*, 474 Mich at 89 n 8.

## B. DEPARTURE SENTENCE

Rimson's final argument on appeal is that his sentence for involuntary manslaughter is unreasonable and therefore an abuse of the trial court's sentencing discretion. We disagree.

Rimson was sentenced on November 10, 2015, after our Supreme Court's decision in *People v Lockridge*, 498 Mich 358; 870 NW2d 502 (2015), which drastically altered the law pertaining to the sentencing guidelines.[5] In *Lockridge*, our Supreme Court held that the sentencing guidelines, which the trial court must still consider at sentencing, may no longer be considered mandatory. *Id*. at 391-392.[6] Post-*Lockridge*, a trial court, after calculating the appropriate sentencing guidelines range, "may exercise its discretion to depart from that guidelines range without articulating substantial and compelling reasons for doing so. A sentence that departs from the applicable guidelines range will be reviewed by an appellate court for reasonableness." *Id*. at 392. The trial court must "justify the sentence imposed in order to facilitate review." *Id*. Resentencing is required if this Court finds the sentence unreasonable. *Id*.

---

[5] In the present appeal, the prosecutor voices his disagreement with the *Lockridge* decision. Of course, this Court is bound to follow *Lockridge* and has no authority to alter that decision. *Associated Builders & Contractors v Lansing*, 499 Mich 177, 191-192; 880 NW2 765 (2016).

[6] The prosecutor contends on appeal that the sentencing guidelines are still mandatory under *Lockridge* in certain circumstances, specifically, when judicial fact-finding does not enhance a defendant's sentence. This Court has rejected the prosecutor's argument, holding that post-*Lockridge*, the sentencing guidelines are advisory in all cases. *People v Rice*, ___ Mich App ___, ___; ___ NW2d ___ (2017).

In *People v Steanhouse*, 313 Mich App 1, 42-48; 880 NW2d 297 (2015), lv gtd 499 Mich 934 (2016), a case decided approximately a week before Rimson's sentencing proceeding, this Court considered what standard to apply when determining whether a departure sentence is reasonable under *Lockridge*. This Court considered two potential standards: the standard utilized by the federal courts, and the "principle of proportionality" standard articulated in *People v Milbourn*, 435 Mich 630; 461 NW2d 1 (1990), which was used in this state before the enactment of the legislative sentencing guidelines. *Steanhouse*, 313 Mich App at 42-48. Ultimately, this Court adopted the *Milbourn* standard instead of the federal standard. *Id*. at 46-48.[7]

Under *Milbourn*'s principle of proportionality standard, a sentence must be " 'proportionate to the seriousness of the circumstances surrounding the offense and the offender.' " *Steanhouse*, 313 Mich App at 45, quoting *Milbourn*, 435 Mich at 636. The Court discussed various factors to consider when applying this test from past decisions:

> Factors previously considered by Michigan courts under the proportionality standard included, among others, (1) the seriousness of the offense, (2) factors that were inadequately considered by the guidelines, and (3) factors not considered by the guidelines, such as the relationship between the victim and the aggressor, the defendant's misconduct while in custody, the defendant's expressions of remorse, and the defendant's potential for rehabilitation. [*Steanhouse*, 313 Mich App at 46 (Citations omitted).]

In the case of a departure, this Court's first inquiry should be into whether the matter involves circumstances not adequately accounted for by the variables that are scored under the sentencing guidelines. *Id*. at 45. A departure without such circumstances should alert this Court to the possibility that the trial court has abused its sentencing discretion by violating the principle of proportionality. *Id*. at 46. And even when a departure seems appropriate, we recognize that the extent of the departure may violate the principle of proportionality. *Id*.

---

[7] Soon after *Steanhouse* was decided, a different panel of this Court considered the same question, and indicated that were it not for *Steanhouse*, it would have adopted the federal standard. *People v Masroor*, 313 Mich App 358; 880 NW2d 812 (2015). The *Masroor* panel declared a conflict with *Steanhouse*, but this Court declined to convene a conflict panel. *People v Masroor*, unpublished order of the Court of Appeals, entered December 18, 2015 (Docket No. 322280). Our Supreme Court has since granted leave in *Steanhouse* and *Masroor*, and one of the issues to be decided is "what standard applies to appellate review of sentences following the decision in *People v Lockridge*." *Steanhouse*, 499 Mich at 934 (2016).

In the present matter, the prosecutor argues that *Steanhouse* was wrongly decided and advocates for the position taken by the *Masroor* panel. We are bound by *Steanhouse* unless and until that decision is altered by our Supreme Court. See MCR 7.215(C)(2) (explaining that a published opinion of this Court has precedential effect, and that the "filing of an application for leave to appeal to the Supreme Court or a Supreme Court order granting leave to appeal does not diminish the precedential effect" of a published opinion.).

Rimson contends that the trial court's sentence, a departure from the minimum sentence range of 43 to 86 months called for by the sentencing guidelines, was unreasonable. Rimson contends that the trial court disagreed with his jury's decision to acquit him of murder and that the trial court's upward departure was made in an effort to make up for this perceived error. The record does not support Rimson's argument. At sentencing, the trial court indeed expressed some disagreement with the jury's verdict; however, the trial court explained that it was not the trial court's "job to undo the verdict that [the jury] reached." The trial court then explained that it was departing from the sentencing range because Rimson appeared to be an intelligent person who would have known Immanuel needed medical treatment. The trial court believed Rimson chose not to seek out such care, either because he was "afraid of getting in trouble" or because Rimson was following directions from Foster. Because Rimson does not argue that the trial court's departure sentence violates the principle of proportionality in light of the trial court's actual reasoning for the departure, he has failed to demonstrate an error warranting relief.

## III. DOCKET NO. 331148

## A. JUDICIAL BIAS

Foster contends that through the questioning of witnesses, the trial court exhibited bias that denied her a fair trial. We disagree. "The question whether judicial misconduct denied defendant a fair trial is a question of constitutional law that this Court reviews de novo." *People v Stevens*, 498 Mich 162, 168; 869 NW2d 233 (2015).

With regard to a trial court's questioning of witnesses, it must first be recognized that as a general matter, a trial court is permitted to question witnesses. *Id*. at 173; see also MRE 614(b). "[T]he central object of judicial questioning should be to clarify." *Stevens*, 498 Mich at 173. Thus, "it is appropriate for a judge to question witnesses to produce fuller and more exact testimony or elicit additional relevant information." *Id*. But the trial court's ability to question witnesses is subject to certain limitations. The court must be careful not to exhibit disbelief of a particular witness, even if unintentional. *Id*. at 174. The court must also refrain from allowing its personal views on disputed factual issues to become apparent to the jury. *Id*.

Second, we must consider the tone of the questioning, a task that can be difficult given that usually appellate courts "do not have the benefit of viewing a trial judge's tone and demeanor first hand." *Id*. at 176. We must examine the "nature of the words used by the judge" to see if the record indicates the existence of "hostility, bias, or incredulity." *Id*. But, importantly, judicial questioning may become "more necessary when a judge is confronted with a difficult witness who refuses to answer questions posed by attorneys or repeatedly responds to those questions with unclear answers . . . ." *Id*. at 175-176.

Third, appellate courts must "consider the scope of judicial intervention within the context of the length and complexity of the trial, or any given issue therein." *Id*. at 176. Judicial intervention is more appropriate in a long or complex trial. *Id*. "Fourth, and in conjunction with the third factor, a reviewing court should consider the extent to which a judge's comments or questions were directed at one side more than the other." *Id*. at 176-177.

Finally, "the presence or absence of a curative instruction is a factor . . . ." *Id*. at 177. Jurors are presumed to follow their instructions, and "a curative instruction will often ensure a fair trial despite minor or brief inappropriate conduct. Depending on the circumstances, an immediate curative instruction may further alleviate any appearance of advocacy or partiality by the judge." *Id*. But there are cases where judicial conduct is so egregious that a curative instruction cannot "erase the appearance of partiality." *Id*. at 177-178.

Foster seems to argue that the entire trial was infected by judicial bias because the trial court questioned nearly every witness, but she cites only a single instance of allegedly improper questioning. We conclude that Foster has abandoned any claims of judicial bias with the exception of the one instance she actually cites. See *People v Petri*, 279 Mich App 407, 413; 760 NW2d 882 (2008) (a defendant may not leave it to the appellate court to search for a factual basis to support an argument). And in any event, the fact that the trial court questioned nearly every witness would tend to show the absence of bias. See *Stevens*, 498 Mich at 177 ("Judicial partiality may be exhibited when an imbalance occurs with respect to either the frequency of the intervention or the manner of the conduct").

The sole instance of alleged impartiality actually discussed by Foster does not demonstrate bias. One witness, Rimson's sister, Pauletta Lawrence, testified regarding her observations of Immanuel and his family during the weeks before his death. After the attorneys finished questioning Lawrence, the trial court asked Lawrence several questions, all aimed at clarifying various facets of her testimony. In the midst of this testimony, the trial court asked Lawrence to compare her own son to Immanuel in terms of height and weight. Lawrence testified that her son, who was three years younger than Immanuel, was shorter than Immanuel, but weighed more. The trial court then asked Lawrence if it struck her as "odd that Manny was so skinny?" Lawrence answered in the affirmative. Foster argues that the trial court's questions asking Lawrence to compare her son to Immanuel exhibited bias and denied her a fair trial.

Considering the trial court's questioning of Lawrence as a whole, we conclude that the trial court's overall goal was to clarify Lawrence's testimony and elicit further detail, both entirely proper objectives. *Stevens*, 498 Mich at 173. With regard to the specific line of questioning quoted above, we note that Rimson's counsel had questioned Lawrence regarding her interactions with Immanuel, which included a question as to whether Immanuel appeared skinny when Lawrence saw him two weeks before his death. Asking Lawrence to compare Immanuel's size to that of Lawrence's son, as well as the question regarding whether Lawrence found Immanuel's size odd, provided further relevant detail to the meaning of Lawrence's testimony that Immanuel was skinny.

Nothing in the trial court's questioning suggested disbelief or any personal views of the trial court. See *Stevens*, 498 Mich at 174. There is nothing in the record indicating that the trial court's tone was improper, such as words that would indicate hostility or bias. See *id*. at 174-176. The trial court's questioning was also appropriate given that this was a lengthy, multi-defendant trial. Nor did the trial court appear to favor the witnesses of one side over another. *Id*. The trial court also, before any trial testimony was presented, instructed both juries that it "may ask some of the witnesses questions[] myself. These questions are not meant to reflect my opinion about the evidence. If I ask questions, my only reason would be to ask about things that may not have been fully explored." When giving the juries their final instructions, the trial court

explained that if any juror believed the court had an opinion regarding the case, he or she "must pay no attention to that opinion." Any remote possibility that a juror perceived any bias by the trial court was cured by these instructions. See *Stevens*, 498 Mich at 177. None of the factors regarding bias identified in *Stevens* would lead to a conclusion that Foster was denied a fair trial.

## B. SUFFICIENCY OF THE EVIDENCE – TORTURE

Foster contends that the prosecutor failed to present sufficient evidence to support her torture conviction. We disagree.

Whether sufficient evidence has been presented to support a criminal conviction is a question of law reviewed de novo. *People v Harverson*, 291 Mich App 171, 176-177; 804 NW2d 757 (2010). "When reviewing the sufficiency of the evidence to support a conviction, this Court must view the evidence in the light most favorable to the prosecutor and determine whether a rational trier of fact could find that the essential elements of the crime were proved beyond a reasonable doubt." *People v Watson*, 245 Mich App 572, 594; 629 NW2d 411 (2001).

Michigan's torture statute, MCL 750.85, provides, in relevant part:

(1) A person who, with the intent to cause cruel or extreme physical or mental pain and suffering, inflicts great bodily injury or severe mental pain or suffering upon another person within his or her custody or physical control commits torture and is guilty of a felony punishable by imprisonment for life or any term of years.

(2) As used in this section:

* * *

(b) "Custody or physical control" means the forcible restriction of a person's movements or forcible confinement of the person so as to interfere with that person's liberty, without that person's consent or without lawful authority.

Under the statute, there are three elements that must be established to convict a defendant of torture: (1) the defendant inflicts great bodily injury or severe mental pain or suffering upon another person; (2) the person who suffered the injury, pain, or suffering was within the defendant's custody or physical control, and (3) the defendant intended to cause cruel or extreme physical or mental pain and suffering. MCL 750.85(1). Foster challenges only whether the second and third of these elements were sufficiently proved.

MCL 750.85(2)(b), the defines "custody or physical control" to mean "the forcible restriction of a person's movements or forcible confinement of the person so as to interfere with that person's liberty, without that person's consent or without lawful authority." Foster argues there was inadequate proof that the custody or control she exercised over Immanuel was without his consent. Because Foster agrees that she exercised custody or control over Immanuel, the only question is whether the prosecutor proved that Immanuel did not consent. In this regard, Foster's only argument is that Immanuel loved his mother. While this may have been true, it does not mean that he consented to being confined or having his movement restricted. Rather, a reasonable juror could find that because of Immanuel's age, he lacked the capacity to consent.

-8-

Foster also contends that there was insufficient evidence that she had "the intent to cause cruel or extreme physical or mental pain and suffering . . . ." MCL 750.85(1). But, "intent may be inferred from circumstantial evidence." *People v Henderson*, 306 Mich App 1, 11; 854 NW2d 234 (2014). Because it may be difficult to prove a defendant's state of mind, minimal circumstantial evidence will be sufficient to prove a defendant's state of mind. *Id*.

More than minimal circumstantial evidence of Foster's intent was presented at trial. Immanuel's body told the story of a child who had been malnourished and physically abused for some time. Schmidt opined that he had likely been deteriorating for months, and the existence of scar tissue around one particular lesion indicated that Immanuel had spent long periods of time immobilized for more than six weeks before his death. He had been eating raw food and also stealing food, clear signs that he was hungry. He had been unable to control his bowels for several months before his death, another plain and obvious sign that he was in distress.

The evidence tended to show that Foster was well aware that Immanuel was suffering. Foster knew Immanuel could not control his bowels, yet Rimson was whipping Immanuel for this reason. Foster wrote directions for Immanuel's care, including instructions that he be given ibuprofen three times a day. This is evidence that Foster knew Immanuel was in pain. Foster also talked about putting cream on Immanuel's feet, which demonstrates that she was well aware that he was developing significant medical issues in his feet. Although expert testimony indicated that Immanuel's feet deteriorated over a period of weeks, Foster failed to seek any medical care or treatment. Rather, she moved to Saginaw and left Immanuel in Rimson's care even though she knew Rimson physically abused Immanuel. When asked to explain why she left Immanuel in Rimson's care and did not seek medical treatment for him, Foster explained that she was afraid that all of her children would be taken by child protective services. From this evidence, a rational juror could conclude that Foster chose to allow Immanuel to suffer extreme physical and mental pain rather than risk other consequences. Accordingly, there is sufficient evidence of Foster's intent to support a conviction of torture. See MCL 750.85(1).[8]

## C. JURY SELECTION

Foster contends that the trial court erred when it failed to strike a juror for cause after that juror explained that he or she[9] was a Jehovah's Witness. She further contends that counsel was likewise ineffective for failing to request that this juror be stricken for cause or, alternatively, exercising a peremptory challenge to strike the juror. We disagree.

---

[8] Foster contends that she had no intent to harm Immanuel. She explains that as a layman, she could not be expected to diagnose sepsis. This argument misses the point. Expert testimony explained that sepsis was the end result of a lengthy process that began with malnourishment. The lack of adequate nourishment prevented Immanuel's immune system from responding to an infection, which progressed to pneumonia, and eventually, sepsis. Foster could have seen any of these earlier signs of distress.

[9] The record does not reveal the identity or gender of this juror.

Because Foster did not ask that the juror be stricken in the trial court, to the extent she challenges the trial court's actions, she has not preserved the issue. *People v Hanks*, 276 Mich App 91, 92; 740 NW2d 530 (2007). Accordingly, we review the issue for plain error affecting Foster's substantial rights. *Id.* To establish plain error requiring reversal, Foster must demonstrate that an error occurred, that "the error was plain, i.e., clear or obvious," and that "the plain error affected substantial rights." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). Even if she satisfies these requirements, this Court "must exercise its discretion in deciding whether to reverse. Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id.* (quotation marks, brackets, and citation omitted).

With regard to Foster's claim that counsel was ineffective, we note that the question of whether defense counsel performed ineffectively is a mixed question of law and fact. This Court reviews for clear error the trial court's findings of fact and reviews de novo questions of constitutional law. *People v Trakhtenberg*, 493 Mich 38, 47; 826 NW2d 136 (2012). Because Foster did not seek a new trial or a *Ginther*[10] hearing, this Court's "review is limited to mistakes apparent on the record." *People v Rodriguez*, 251 Mich App 10, 38; 650 NW2d 96 (2002).

Foster's jury was selected over the course of an entire day. After the jury was selected, but before it was sworn, three members of the jury raised issues with the trial court. The third of these jurors explained that he or she did not want to serve on the jury because of "spiritual reasons" because he or she was a Jehovah's Witness. The trial court explained:

> Oh, well, you know, if you really felt that way, I have had a lot of Jehovah['s] [W]itnesses, Muslims, all kinds of people of different faiths.
>
> Too late. You, if you felt that way, you would have said something from the beginnin[g]. I'm not buyin' [sic]. I'm not havin[g] it. I will see you back here tomorrow.
>
> We will begin this trial tomorrow. You are the jury that we have selected.

Foster raised no objection in the trial court. She now contends that the trial court should have excused the juror or, at a minimum, questioned the juror regarding his or her religious beliefs and reasons for not wanting to sit on the jury. Foster explains that a basic tenet of the juror's purported faith is the inability to sit in judgment of others.

To be entitled to relief, Foster must first demonstrate the existence of a plain error. It is clear that the trial court did not believe the juror was telling the truth. And given the late mention of the juror's supposed religious affiliation, the trial court's suspicions were quite reasonable. From the record available, there is no way to determine whether the juror was, in fact, a Jehovah's Witness. As there is no way to determine whether the purported error actually

---

[10] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

occurred (i.e., that a Jehovah's Witness sat on the jury), Foster fails to establish the existence of a plain error. But even assuming plain error occurred, we find Foster would still not be entitled to relief. The only potential effect of having this juror sit on the jury, as derived from Foster's argument on appeal, is that the juror could not sit in judgment of others. Assuming this is true, the effect of having this individual on the jury would benefit Foster. The juror would, at least potentially, be restricted by his or her religious beliefs from returning a guilty verdict. As Foster cannot show any prejudice, she cannot establish plain error warranting relief. *Carines*, 460 Mich at 763.

Foster also contends that trial counsel was ineffective for failing to challenge the trial court's decision and for failing to exercise a peremptory challenge to remove the juror. "In order to obtain a new trial, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *Trakhtenberg*, 493 Mich at 51. Furthermore, with respect to counsel's performance, "a defendant must overcome the strong presumption that counsel's performance was born from a sound trial strategy." *Id.* at 52.

As explained, assuming the juror was actually a Jehovah's Witness, one must conclude that Foster likely stood to benefit from having this individual serve on the jury. For that reason, Foster cannot overcome the presumption that trial counsel's apparent decision not to seek the juror's removal was sound strategy. Nor can she demonstrate that a different result was in any way probable had counsel attempted to remove the juror. In sum, we find Foster is not entitled to relief.

### D. DEPARTURE SENTENCE

Foster challenges that the trial court's sentence satisfied the principle of proportionality that, as we have explained in Section II(B) of this opinion, controls the review of departure sentences. Applying this standard, we find the trial court's sentence reasonable.

While Foster cites the proper test, she fails to explain how her sentence does not comport with the principle of proportionality. She simply explains that the sentence was "extremely harsh, unfair and unreasonable regarding someone who was convicted of a crime involving an unintended result." [11] Foster may not simply leave it to this Court to "unravel and elaborate" her arguments. *People v Waclawski*, 286 Mich App 634, 679; 780 NW2d 321 (2009).

In any event, we cannot conclude that the trial court's sentence was unreasonable. The trial court cited a wide variety of factors supporting its decision to depart from the guidelines. The trial court noted that throughout the trial, Foster exhibited no remorse, and the first time she demonstrated any emotion was when her sentence was about to be announced. A defendant's lack of remorse is a factor that is not considered by the sentencing guidelines and tends to support a departure from the sentencing guidelines. *Steanhouse*, 313 Mich App at 46.

---

[11] We note that Foster's convictions of first-degree child abuse and torture *do* involve an element of intent, albeit not the intent for Immanuel to die.

The trial court further explained that Immanuel essentially died from starvation, which prevented his body from fighting off infection. The trial court found these circumstances "sickening." The trial court believed that Foster knew that Immanuel was suffering, but chose to leave the home because she was more concerned with herself than his well-being. The trial court believed that by leaving a note regarding Immanuel's care, Foster was leaving "instructions on how [Immanuel] could be made comfortable until he died." The trial court also cited the severity of the torture Immanuel suffered: He was malnourished, had many ulcerated lesions showing he was not able to move, and had clearly been physically abused. And near the end of his life, Immanuel's feet turned gangrenous. Several toes died, which according to Schmidt, would have been "exquisitely painful." These facts depict the overall seriousness of the offense and also tend to support an upward departure from the sentencing guidelines. *Id*.

The trial court cited another factor in announcing its sentence: the effect Foster's crimes would have on her other children. As the trial court explained, the sentencing guidelines do not account for the effect that Immanuel's death would have on his sisters, who lived in the same household, and in all likelihood witnessed him suffering until his death. Because the sentencing guidelines do not account for this generational impact on Immanuel's siblings, this, too, supports an upward departure. *Id*.

Nor is the extent of the departure unreasonable. As calculated by the trial court, the top of Foster's sentencing guidelines range was 225 months, or 18 years and 9 months. The trial court sentenced Foster to a minimum sentence of 27 years. Thus, the trial court's departure increased Foster's minimum sentence by approximately 50% of the highest minimum sentence under the sentencing guidelines. Given the severity of the crimes, the extreme suffering that Immanuel experienced, the likely effect of Foster's crimes on Immanuel's siblings, and Foster's lack of remorse, we cannot say that the extent of the departure was disproportionate.

## E. INSTRUCTIONAL ERROR[12]

Foster contends that the trial court erred by including additional language, requested by the prosecutor, when it instructed the jury on the elements of torture. We conclude that Foster waived her claims of error.

On the prosecutor's motion, the trial court agreed to supplement the standard jury instruction on torture, M Crim JI 17.36. After providing the standard instruction, the trial court added the following language:

> When thinking about this, you may consider whether given Immanuel Foster's age, and the dependent nature of his rela – of the relationship he had with the defendants, he had the capacity to consent to any exercise of forcible confinement of his person, any exercise of forcible restriction of his movement, or any exercise of custody or physical control.

---

[12] This and the remaining issues discussed in this opinion were raised by Foster in a pro se brief filed pursuant to Administrative Order 2004-6, Standard 4.

When the prosecutor's proposed amendment was discussed in the trial court, Rimson's counsel objected to additional language generally, arguing that it was unnecessary. Rimson's counsel then argued that if the trial court were to give the instruction, it should remove the word "dependent," and also change the word "caregivers," the word requested by the prosecutor to refer to Rimson and Foster, to "defendants." With regard to the word "dependent," the rationale of Rimson's counsel's was that including this word amounted to a factual finding that the relationship between Immanuel and defendants was a dependent one. With regard to the word "caregiver," his rationale was one of consistency in the way the trial court referred to defendants. Foster's counsel made almost no argument with regard to the proposed instruction, stating only:

> Your Honor, I agree with co-counsel here. I think that if you strike the word dependent from that sentence, and strike the word caregiver and make it defendant . . . well, yeah, then the jury can make a decision as to what that means based on the evidence that they've heard.

Ultimately, the trial court included the word "dependent," reasoning that there was no factual dispute regarding whether the relationship between Immanuel and defendants was a dependent one. The trial court agreed that it would be best to refer to Rimson and Foster as defendants rather than as caregivers. After the trial court instructed the jury and gave this amended instruction, it asked counsel for both defendants if there were any additional concerns with regard to the instructions that had been provided. Both attorneys answered in the negative.

We conclude that Foster waived her challenges to the additional language included by the trial court. Waiver is the intentional relinquishment of a known right. *People v Kowalski*, 489 Mich 488, 503; 803 NW2d 200 (2011). "When defense counsel clearly expresses satisfaction with a trial court's decision, counsel's action will be deemed to constitute a waiver." *Id*. And, of course, waiver extinguishes any error. *Id*. Foster now challenges the entire instruction, arguing that it was erroneous and prejudicial. But in the trial court, Foster's counsel did not take issue with the instruction as a whole. Rather, Foster's counsel apparently agreed with co-counsel's alternative argument, which requested only that certain wording of the instruction be changed. Counsel explained that if the instruction were worded slightly differently, "then the jury can make a decision as to what that means based on the evidence that they've heard." This comment expresses approval of the decision to give the instruction as a general matter. So, too, did counsel's negative response to the trial court's question asking if any party had any further objections to the instructions as given. As such, Foster waived any challenge, such as those she raises on appeal, challenging the decision to give the instruction at all.[13]

## F. SUFFICIENCY OF THE EVIDENCE – FIRST-DEGREE CHILD ABUSE

Foster contends that the prosecutor failed to present sufficient evidence to support her first-degree child abuse conviction. We disagree.

---

[13] Foster does not argue on appeal that the word "dependent" was improper, which was the only preserved issue regarding the amended instruction not resolved in her favor in the trial court.

The child abuse statute, MCL 750.136b(2), provides the following:

A person is guilty of child abuse in the first degree if the person knowingly or intentionally causes serious physical harm or serious mental harm to a child. Child abuse in the first degree is a felony punishable by imprisonment for life or any term of years.

Foster argues that there was insufficient evidence presented at trial demonstrating that she intended to harm Immanuel. As our Supreme Court has explained, to sustain a conviction under MCL 750.136b(2), the prosecutor must prove that "the defendant intended to cause serious physical or mental harm" or "knew that serious mental or physical harm would be caused . . . ." *People v Maynor*, 470 Mich 289, 295; 683 NW2d 565 (2004). Viewing the evidence in a light most favorable to the prosecution, the evidence supports such a finding. As explained in section III(B) of this opinion, Immanuel's body told the story of a child who suffered serious physical harm for months before his death. There was also evidence demonstrating that Foster was aware that Immanuel was suffering, but she chose to leave him with an abusive caregiver, Rimson, rather than remove him from this abusive environment and seek medical treatment. Given that intent may be proven with minimal circumstantial evidence, *Henderson*, 306 Mich App at 11, sufficient evidence was presented to allow a rational trier of fact to find that Foster intended to cause serious mental or physical harm to Immanuel.

Foster largely relies on portions of her own statement to police, in which she attempted to justify her decisions to leave Immanuel with Rimson and to not seek medical care. She argues that these statements demonstrate that she did not intend to harm Immanuel. Ultimately, what Foster points to is a dispute regarding how to interpret her statements and conduct. It is the jury's role to resolve such disputes. *People v Unger*, 278 Mich App 210, 222; 749 NW2d 272 (2008). "All conflicts in the evidence must be resolved in favor of the prosecution and [this Court] will not interfere with the jury's determinations regarding the weight of the evidence and the credibility of the witnesses." *Id*. Foster's argument lacks merit.

## G. INEFFECTIVE ASSISTANCE OF COUNSEL

Finally, Foster contends that counsel was ineffective for failing to request that the jury be instructed on the offenses of third- and fourth-degree child abuse. We disagree.

Foster contends that third- and fourth-degree child abuse are lesser-included offenses of first-degree child abuse, and thus, trial counsel was ineffective for failing to request that the trial court instruct the jury on these lesser offenses. Assuming, without deciding, that third- and fourth-degree child abuse are lesser included offenses of first-degree child abuse,[14] we find counsel was not ineffective. " '[I]t is not error to omit an instruction on such lesser offenses, where the evidence tends only to prove the greater . . . .' " *People v Cornell*, 466 Mich 335, 355-

---

[14] We have found no authority, and Foster cites none, holding that third- and fourth- degree child abuse are lesser included offenses of first-degree child abuse.

356; 646 NW2d 127 (2002), quoting *People v Patskan*, 387 Mich 701, 711; 199 NW2d 458 (1972). In this case, the evidence only tended to prove the greater.

One distinguishing characteristic between first-degree child abuse and third- and fourth-degree child abuse is the degree of harm inflicted on the child. A conviction of first-degree child abuse must rest on proof of "serious physical or serious mental harm to a child." MCL 750.136b(2). Third-degree child abuse rests on proof of "physical harm to a child." MCL 750.136b(5)(a) and (b). Fourth-degree child abuse rests on proof of either "physical harm to a child[,]" MCL 750.136b(7)(b), or the creation of an unreasonable risk of harm or injury, regardless of whether physical harm actually results, MCL 750.136b(7)(c). "Physical harm" is defined as "any injury to a child's physical condition[,]" MCL 750.136b(1)(e), while "serious physical harm" is defined as "any physical injury to a child that seriously impairs the child's health or physical well-being, including, but not limited to, brain damage, a skull or bone fracture, subdural hemorrhage or hematoma, dislocation, sprain, internal injury, poisoning, burn or scald, or severe cut[,]" MCL 750.136b(1)(f). In this matter, the evidence only tended to prove that Immanuel suffered severe physical harm. Immanuel died as a result of being malnourished, leaving him unable to fight off infection. His body was covered in lesions. The toes of his feet died before he did as the result of gangrene. There is simply no rational way to characterize these injuries as merely "physical harm," as opposed to "serious physical harm," as those terms are defined by statute. As such, even assuming third- and fourth-degree child abuse are lesser-included offenses of first-degree child abuse, we can find no error in failing to instruct the jury on these charges. *Cornell*, 466 Mich at 355-356.

Consequently, counsel cannot be deemed ineffective for failing to request instructions on these offenses. See *Unger*, 278 Mich App at 255 ("Trial counsel was not ineffective for failing to file a meritless motion.").

We affirm.

/s/ Jane E. Markey
/s/ Patrick M. Meter
/s/ Douglas B. Shapiro